MECHANICS' NAT. BANK OF PROVIDENCE et al. v. ROUGHEAD et al.

(Supreme Court, Appellate Division, Fourth Department. November 25, 1902.)

1. CONTRACTS—BREACH—RIGHT OF ABANDONMENT.

Action of a deputy sheriff in going to the factory of a firm to make a
levy under execution on a judgment against the firm, where he did not
take any actual possession of the property, and did nothing more than
walk into the factory and out again, and make an indorsement on the
execution, and where he went to the factory contrary to the instructions
of the execution creditor, did not furnish ground for the termination by
the partners and the wife of one of them of an agreement with the firm
creditors for the settlement of the firm debts, though such agreement pro-
vided that the creditors should not seek to enforce their claims by hostile
proceedings.

2. SAME—CONSIDERATION.

A partner, pursuant to an antenuptial agreement, fraudulently con-
veyed to his wife property purchased with firm funds. The firm, through
the fraudulent conduct of such partner, became indebted on loans obtained
by him which it could not pay. The creditors, partners, and the wife
who had received the conveyance, entered into an agreement for the set-
tlement of the debts, whereby a corporation was to be formed, to which the
firm property remaining and the property received by the wife should be
conveyed in consideration of the capital stock, which should be turned over
to one of the partners and the wife. The corporation was to issue bonds in
payment of the firm debts secured by a mortgage, and the creditors
were to surrender their claims against the firm. The conveyances were
made and deposited with an agent of all the parties in escrow, on condi-
tion that the creditors should perform their part of the agreement within
a specified time. Held that, though the wife's ownership of the property
was based on a good and valid consideration, the conveyance by her to the
corporation was founded on a sufficient consideration, the transfer by the
partner to the wife constituting an equitable fraud, rendering litigation
as to the wife's right to the property probable, and the agreement and
transfer enabling the partners to continue in business, and, together with
the wife, to obtain the capital stock of the corporation.

3. SAME.

The conveyance was also supported by a consideration moving from the
creditors of the firm, who from the time of the agreement of settlement
to the date of the conveyance continued, at considerable expense, to carry
out the agreement, and refrained from taking any proceedings on their
claims either against the firm or against the wife.

4. INSTRUMENTS—DELIVERY IN ESCROW—RIGHT TO RECALL.

Instruments conveying property to a corporation pursuant to an agree-
ment for the settlement of the debts of a firm were deposited in escrow in
the hands of an agent, under an agreement that the agent should hold

them for two weeks, and if within that time the creditors of the firm assented to the plan of settlement, and surrendered their evidences of firm indebtedness, the instruments were to be delivered to the corporation. *Held,* that the escrow arrangement was a part of the general arrangement for the settlement of the firm debts, and an advantage to the debtors in limiting the time for the compliance therewith by the creditors, but did not authorize the grantors to revoke the agreement, and recall the instruments, within such two weeks, and before compliance by the creditors.

5. SAME—PERFORMANCE OF CONDITIONS—EFFECT.

Where deeds of conveyance are deposited in escrow on conditions to be performed by another and without original consideration, the grantors may revoke the escrow agreement before such other party has performed the conditions, but on the performance thereof the agreement is irrevocable.

6. SAME—EVIDENCE OF PERFORMANCE OF CONDITIONS.

Evidence *held* to show that the conditions on which deeds of conveyance were deposited in escrow were fulfilled in the time prescribed, so that the grantors therein could not revoke the escrow agreement and withdraw the deeds, though this could have been done before such performance.

7. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—COMPLETENESS.

A firm became unable to pay its debts as a result of the fraudulent conduct of one of the partners, who, pursuant to an antenuptial agreement, conveyed to his wife property procured from firm funds. The partners and wife assented to a plan for the settlement of the firm debts, which provided for the organization of a corporation to carry on the firm business, to which corporation the firm property remaining and the property held by the wife should be conveyed in consideration of the capital stock, a part of which should be held in trust for the purpose of securing the control of the corporation. The trustees of the corporation should consist of three persons named. The corporation should issue bonds, secured by a mortgage on its property, to pay the creditors. Some of the creditors refused to assent to the proposal, and further negotiations were had, which resulted in an agreement that provided for the appointment of five directors, and also made provisions for the conduct of the corporation business, etc. Pursuant to the agreement, the firm and the wife's property were conveyed to the corporation, and the deeds were deposited in escrow with an agent. *Held,* that the agreement was sufficiently complete to authorize the court to decree, at the suit of the creditors, a specific performance thereof.

Appeal from trial term, Erie county.

Action for specific performance by the Mechanics' National Bank of Providence, R. I., and others against David Roughead and another, impleaded with Edward A. Jones and another. From a judgment for plaintiffs, defendants appeal. Modified.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, and DAVY, JJ.

Eugene M. Bartlett, for appellants.

William L. Marcy, for respondents.

HISCOCK, J. This action was brought to secure, in effect, specific performance of an alleged agreement made by the defendants, other than McNabb, for the settlement of a large amount of indebtedness held by plaintiffs against the defendants Edward A. Jones and David Roughead, and to that end, and as a substantial feature of such agreement, to compel the delivery by the defendant McNabb, who held the same in escrow from the defendants Roughead and Emma M. Jones, of various deeds and transfers of property to a corporation

organized by and in behalf of the plaintiffs and the appellants other than McNabb, and concurrent with which said corporation was to deliver bonds secured by a mortgage upon the property conveyed to it by the transfers held by said McNabb in escrow, in the amount of indebtedness held by the plaintiffs, respectively, against said defendants Jones and Roughead, said creditors, coincidently with the delivery of said bonds to them, giving up and surrendering their notes or other evidences of debt. The judgment appealed from awarded to plaintiffs substantially the relief asked above.

It is urged upon this appeal, as it was upon the trial below, that there are various reasons why said judgment should not have been awarded. The main reasons advanced, in substance, were and are that no such definite agreement of settlement was reached as to permit of an action for specific performance; also that there was not sufficient consideration moving to the defendants, and especially the defendant Emma M. Jones, to furnish the basis for compulsory enforcement thereof; also that, within the legal privileges possessed by them so to do, the defendants Roughead and Emma M. Jones revoked their consent for the delivery by the defendant McNabb of the various transfers which had been placed in his hands in escrow, and terminated the arrangement under which he held the same; also that the plaintiffs lost their right to have the alleged agreement of settlement carried out through the violation by one of their number of its obligations through issuing an execution against the property of Jones and Roughead while negotiations were pending.

We think that the evidence was sufficient in behalf of plaintiffs to authorize and sustain the judgment, and that the same should be affirmed.

For some time prior to November 23, 1901, the defendants Edward A. Jones and David Roughead were engaged as copartners, under the name of Excelsior Machine Company, in carrying on a manufacturing business in or near the city of Buffalo. Roughead was the practical manufacturing man of the copartnership, and Jones had charge of the finances. The latter was concededly dishonest in his business operations. Without the knowledge of his copartner, as it is claimed, he employed copartnership funds for personal speculation, and took in his own name the title to a large amount of property purchased therewith. He secured the funds with which to conduct these illegal operations, and to keep the copartnership business running, by large loans which were obtained in the firm name upon false representations, and which were obtained in large part, at least, from the plaintiffs in this action under such circumstances as concededly constituted larceny. While these operations were going on, and in the summer of 1901, as it is alleged in behalf of the appellants, he met the defendant, now Emma M. Jones, and became engaged in marriage to her, with an attendant antenuptial agreement which provided for the transfer by him to her of property standing in his name and purchased by him as aforesaid with copartnership funds, which it must be assumed were obtained in whole or part from the plaintiffs, of the value of upwards of $50,000. Subsequently the marriage took place, and the property was transferred in accordance with said alleged

agreement.  Apparently the financial affairs of the copartnership dur-
ing this same time were reaching such desparate straits that Jones
concluded he could not any longer, even by criminal methods, keep
the same afloat.  He acquainted his copartner Roughead with what
he had been doing, and during the summer or early fall of 1901 made
to him a transfer of all of his interest in the copartnership plant and
property.  Although Roughead lived with Jones in addition to being
his copartner, this information, it is strenuously urged in his behalf,
was the first intimation which he had of the condition of the firm's
financial affairs.  At this time Jones had succeeded in extracting
from the plaintiffs under the firm name, by the devices aforesaid, the
sum of upwards of $125,000 in discounts.

As the result of these facts and conditions, a meeting of the plaintiff
creditors was called for November 23, 1901, at the office of the coun-
sel for appellants in the city of Buffalo.  It was largely attended
by them, and the members of the debtor copartnership and Mrs.
Jones were also present or represented by counsel.  There seems
to have been a pretty thorough discussion of the situation, attended
with considerable bitterness upon the part of plaintiffs over the situ-
ation into which they had been led, as before stated.  A committee
of creditors was appointed, which held further consultations with the
debtors and Mrs. Jones and their counsel, resulting in a proposed plan
for the settlement of the indebtedness held by plaintiffs.  This plan
was submitted by the committee of creditors to their principals in
a letter prepared on or about December 3d, and dated November 27,
1901.  The general outline of this proposed plan, as set forth, was
as follows:  A corporation was to be organized for the purpose of
continuing and carrying on the business of Jones & Roughead, with
a capital stock of $250,000.  Mrs. Jones and Roughead were to con-
vey to this corporation the property which they held, as hereinbe-
fore stated, and were to receive therefor the capital stock.  Seventy-
five per cent. of this capital stock, however, was to be held in trust
for the purpose of securing the control of the corporation in the man-
agement of its business, etc.  The trustees of said corporation were
to be three in number, one of whom was to be selected by the cred-
itors, and the other two to be Roughead and Mrs. Jones.  This cor-
poration was to issue bonds secured by a mortgage upon the prop-
erty conveyed to it as aforesaid, and which bonds were to be to the
amount of and used for the purpose of retiring the indebtedness held
by the creditors.  Said bonds were to be payable in 10 annual install-
ments.  Further proposed provisions were also submitted as to the
details of the management of the corporation which it is not neces-
sary here to recapitulate at length.  The copartners and Mrs. Jones
approved and assented to this plan, and the creditors to whom it was
submitted as aforesaid were requested forthwith in writing to signify
their approval thereof if in fact it was approved.  All of them except
four signified their approval.  It is evident that the objection of the
latter thereto was wholly or largely based upon the fact that the debt-
ors, in the persons of Mrs. Jones and Roughead, were to have a ma-
jority of the directors of the proposed corporation and the control
incident to such majority.  There were further negotiations between

the appellants and their counsel, the committee of creditors, and the objecting four creditors. The result thereof was that January 18, 1902, Roughead and Mr. and Mrs. Jones duly executed an agreement in writing so modifying the original proposition of November 27, 1901, that the board of directors of the proposed corporation was to be increased from three to five. Mr. Roughead and Mrs. Jones were to be two of these, the creditors at large were to select two, and one Jameson, who represented one of the creditor banks, was to be the fifth; the control of the corporation to this extent, therefore, being thus finally given to the creditors instead of to the debtors. Said supplementary instrument also named the person who was to act as trustee in the mortgage securing the bonds to be issued as aforesaid, and who was to hold in trust the capital stock as above stated. It also reaffirmed the conditions of the original plan of November 27, 1901, except as modified, and contained some additional provisions with reference to the employment of bookkeepers, the keeping of books, etc. Three of the four creditors who had theretofore refused to accept the plan of settlement were represented at the conference at which this instrument was executed, and immediately signified their acceptance of the plan as finally modified. It seems to have been agreed by those present at this conference, including both sides of this controversy, that it was not necessary to secure anew consents from the creditors who had accepted the original proposition, because the modification then made was in their favor and to their advantage. The German Bank of Buffalo was the remaining one of the four creditors from whom acceptance had not theretofore been obtained. Said bank was the liquidating agent of the Metropolitan Bank, formerly of Buffalo, and held its claim as representative and assignee of said Metropolitan Bank. Owing to the double and divided representation of this claim, there seems to have been more or less confusion and uncertainty about it throughout these negotiations. Prior to January 25, 1902, however, an authoritative verbal assurance was given that consent in behalf of said claim would be given to the plan as finally modified, and on or about noon of said last-mentioned date a written instrument to that effect was delivered to the committee of the creditors. Coincident with the execution of the instrument of January 18th, above mentioned, by Mr. and Mrs. Jones and Roughead, instruments and transfers were executed to carry out the plan of settlement. These consisted, among others, of a certificate of incorporation of the proposed new corporation under the name of "Excelsior Machine Company," executed by Emma M. Jones and Roughead, and by the representatives of three of the creditors, and various instruments of conveyance and transfer of real and personal property to said corporation executed by Mrs. Jones and Roughead. By agreement of the parties these transfers were placed in escrow in the hands of the defendant McNabb under an agreement, evidenced by his written receipt and acknowledgment, whereby it was, amongst other things, provided that said instruments were to be held by said trustee for the space of two weeks from the date thereof; that if within said term all of the creditors hereinbefore referred to, excepting therefrom two, formally assented to the

plan of settlement as carried down to that time, and surrendered to Jones and Roughead the notes and other evidences of debt held against the latter, said instruments were to be delivered to the board of directors of said corporation, and coincidently with such surrender said corporation was to execute and deliver to the mortgage trustee theretofore agreed upon the mortgage and bonds outlined in the agreement between the creditors and Roughead and Jones.

Prior to this time the Metropolitan-German Bank claim hereinbefore referred to had been put in suit, and judgment and an execution thereon delivered to the sheriff of Erie county. Such delivery of said execution was accompanied with instructions to the sheriff, in substance, not to do anything thereupon, and for some time nothing was done. On or about January 20th or 21st, however, a deputy sheriff did go to the factory of the former copartnership, and make a very informal and probably inadequate purported levy under said execution. He did not take any actual possession of the property, and in fact seems to have done nothing more than walk into the factory, come away again, and make an indorsement upon his execution. The referee has distinctly found, as we think upon sufficient evidence, that no harm was caused by these steps. What was done was in violation of instructions given to the sheriff when the execution was issued, and the result of confusion and inadvertence. Subsequently, and upon January 27th, said bank withdrew said execution, and executed a satisfaction of its judgment.

About 5 o'clock upon the afternoon of January 25th, Mr. and Mrs. Jones and Roughead served upon the chairman of the committee of creditors, and also upon McNabb, the trustee in the escrow agreement, a notice in effect withdrawing all proposals and propositions by them made, and terminating the agreements and negotiations hereinbefore referred to. Although the two weeks allowed under the escrow agreement had not expired at the time when this notice was served, all of the creditors, acting in response to the plan of settlement as originally proposed or as modified by the instrument of January 18th, had accepted the same, and all of them had forwarded to the representative of the creditors at Buffalo their notes and evidences of debt for surrender to Jones and Roughead, as provided in said escrow agreement, with the exception of two or three, whose notes on or before said date were placed in the United States mail for delivery to the representative of the creditors in Buffalo for that purpose, and with the exception of the German Bank, which had assented to the plan, but whose notes had not been secured because at the moment inaccessible in its vault. Upon forwarding to Albany the certificate of incorporation prepared, it was learned that the name of "Excelsior Machine Company," adopted, had already been so taken by some other corporation as not to be available, and there was a general consent by or in behalf of all parties interested that the name should be changed to "Buffalo Excelsior Machine Company." Mr. Sprague, the chairman of the creditors' committee, had spent some time in preparing a purported draft of the mortgage and by-laws to be executed and adopted by the corporation. He had communicated with the counsel of the appellants with reference to the same, but, through

absence of the latter or other cause, they had not been actually submitted to such counsel for examination.

There was little conflict in the evidence as to the foregoing facts, and the important ones were expressly found by the referee. Upon them and certain others hereafter to be referred to in more detail are presented various questions through the defenses which are earnestly and elaborately urged by appellants' counsel to plaintiffs' right to recover.

Passing for the moment the contention that no agreement was ever reached between the litigating parties of sufficient completeness and definiteness to allow the courts to enforce specific performance thereof, and assuming at this point that said contention is not well founded, we shall take up the discussion of the other questions which seem to require consideration.

It was, of course, a fundamental feature of the negotiations and agreement between the plaintiffs and appellants that none of the former should seek to enforce collection of its claims by hostile proceedings. It is insisted that there was such a levy under the execution issued upon the judgment recovered by the German Bank of Buffalo as violated the rights of appellants, and entitled them to discontinue and cancel all negotiations and agreements. Their notice served upon January 25th, terminating all negotiations and agreements, was founded upon the act in question, and the same has already been referred to. We do not think that it furnished a sufficient or valid reason for withdrawal and termination by defendants of their engagements. The attorney for the bank explicitly instructed the sheriff not to make a levy. When he found that in violation of these instructions a deputy had gone out to the factory to make a levy he ordered him away, simply saying that as long as he was there he might as well make an indorsement upon his execution. We do not believe that any valid levy was made, and it seems to be clear that what was done in that direction was in disobedience of orders and the result of inadvertence and confusion. We do not see or believe that the slightest injury resulted to appellants from the acts in question. Long before this day it had become pretty thoroughly advertised through the proceedings set forth in this record that the defendants, through the criminal proceedings of one of them, had secured large loans, which the firm could not pay, and the compromise and adjustment of which in some way was necessary to secure the continuation of business. Suits had been brought and judgments recovered, and it is not possible, in our opinion, that the act of the sheriff complained of occasioned any additional injury to the standing or position of the firm, or furnished any equitable ground for revocation by appellants of the acts by them up to that time done in the way of settlement.

Of course, the really material interest involved in this litigation and appeal is whether the defendant Emma M. Jones is to part with the property deeded to her by her husband, and transfers of which to the proposed corporation she placed in escrow January 18th. It is insisted by the appellants that there was no agreement between the parties hereto founded upon any adequate consideration which

covered and included the deposit by said appellant and her codefendant Roughead of their conveyances with the escrow agent, McNabb; that, therefore, independent of any violation by the plaintiffs of their obligations, said defendants were entitled to cancel and terminate the deposit in escrow of said transfers at any time before acceptance and compliance by plaintiffs of and with the conditions which attended such deposit. We therefore next pass to the consideration of these issues, upon which we are unable to reach conclusions in accordance with the contentions of appellants.

Before the meeting of plaintiff creditors was called in November, none of the defendants Jones and Roughead was free from interest in the conditions which surrounded or confronted them. Edward A. Jones had been guilty of such fraud in procuring loans in behalf of the copartnership from the plaintiffs as beyond any question subjected him to liability in actions of tort, with the usual incidents of civil arrest. The other copartner, Mr. Roughead, held property which undeniably was subject to the claims of the plaintiffs, and, unless those claims could in some manner be adjusted, destruction of the copartnership business in which he was interested and bankruptcy for himself were inevitable. Mrs. Jones was in the record possession of certain property from her husband. It is asserted that her ownership thereof was based upon the good and valid consideration of her engagement to marry. Upon the other hand, the property which she had thus obtained was purchased with copartnership funds, and originally was subject to the payment of plaintiffs' debts. Its transfer away from them to her under the circumstances in this case was, at least, an equitable fraud by her husband. Litigation thereover was, to say the least, a possibility not beyond the bounds of reasonable contemplation.

Under such circumstances, by and in behalf of said persons, plaintiffs were invited to come to Buffalo to confer upon the situation. As the result of such a conference the plan was proposed which, it is true, called upon the defendants to surrender property which possibly the defendant Emma M. Jones might have been able to hold. But, as a condition and consideration of such surrender, immunity from prosecution was secured, the business in which appellants were directly or indirectly interested was to be preserved, and they were to obtain all of the capital stock of the corporation which it was doubtless hoped and expected would be successful under the proposed plan. Coming only down to this point, it is difficult to see that appellants were not securing advantages and gains under the agreement proposed.

But there is another feature which demands consideration. It is too elementary and well settled to require discussion that a party may be held upon his promise not only by reason of a consideration passing to him therefor, but also by the fact that the opposite party, in reliance upon such promise and agreement, has so done or omitted to do things that he would suffer and be injured if the promise was withdrawn or canceled. Immediately upon the issue of appellants' proposition as contained in the circular letter of November 27th all of the plaintiffs except four signified their acceptance thereof. From that time to the date of service by appellants of their notice of revocation, plaintiffs,

with an expenditure of considerable time and money, continued to negotiate with appellants for the completion and carrying out of the proposed agreement. The remaining four plaintiffs came into the arrangement. During all of this time, with the exception of the German Bank's purported levy already referred to, the plaintiffs refrained from taking any steps or proceedings upon their claims against appellants, and this was done, as the referee has found upon sufficient evidence, upon the promise and agreement of the appellants.

Under all of these circumstances we do not think it can be said, as argued by the appellants' counsel, that there was no consideration underlying and upholding defendants' promises and agreements, and that they had the right to terminate and cancel the same at any time. Under the views which we have expressed upon this point, the escrow agreement and deposit was simply a part and in performance of the general agreement between the parties. The escrow receipt was an advantage to appellants, in that it limited the time for performance by plaintiffs of their part of the agreement to two weeks. Independent of such limitation, the plaintiffs would doubtless have had a reasonable time in which to comply with the terms of appellants' offer and agreement.

If, however, we are wrong in our conclusion that the deposit by appellants in escrow of their transfers was in performance of and in accordance with a valid and binding agreement and arrangement between plaintiffs and defendants, and such deposit is to be regarded rather as a transaction by itself simply in the light of what had taken place between the parties, we still think that appellants did not have the right to revoke and terminate the same as they attempted to. We do not understand that there is serious dispute over some of the general principles which govern a deposit of documents in escrow such as was made in this case. From the time the deposit is made the escrow agent becomes the trustee of both the party making the same and of the one for whose benefit it is made. If the deposit is made under and upon conditions to be fulfilled by another and without original consideration, it is doubtless true that the person making the same may revoke his proposition at any time before the opposite party has complied with the conditions to be by him performed. Upon the other hand, when such opposite party has complied with the conditions and obligations under which the deposit was made, he becomes entitled to the property deposited for his benefit. We think that under these principles, even if defendants originally had the right to revoke the escrow agreement and withdraw their instruments of transfer, the plaintiffs had complied with the conditions by them to be performed prior to the service of the notice of January 25th, and that their rights had thereby become fixed. The substance of the agreement covering the escrow deposit by appellants was that within two weeks from its date, January 18th, plaintiffs were to formally agree to the general plan of adjustment which had been formulated, and also within the same time deliver to Jones and Roughead all of their notes and evidences of debt; this last act, however, being conditioned upon the concurrent delivery by the corporation organized of the mortgage bonds which it was to issue to take up and replace plaintiff's indebtedness. It seems to have

been the understanding between the parties that the modifications of the original plan of settlement made upon January 18th did not necessitate securing new consents by those of plaintiffs who had already signified their acceptance of the original plan. The modifications of January 18th were in favor of the plaintiffs, none of them have ever objected thereto, and we think, especially in the light of what took place between the parties, that it was not necessary to secure new consents from such of plaintiffs as had already consented. Three of the four plaintiffs who had not theretofore done so signified their acceptance of defendants' proposition at the time the transfers were deposited, and the formal consent of the remaining one had been secured upon January 25th, before notice of withdrawal was served by defendants. In accordance with the arrangement which had been approved by defendants, these consents were delivered to Mr. Sprague, who was chairman of the creditors' committee. It must be assumed upon the evidence that defendants were from time to time informed of the execution and delivery of these consents, except, possibly, in the case of the German Bank, and it was the understanding that plaintiffs' counsel or Mr. Sprague was to secure such consent in accordance with an informal verbal agreement that had theretofore been made. Likewise all of the notes which were to be delivered by plaintiffs had been delivered to the creditors' committee for surrender upon the morning of January 25th, except those of three or four creditors whose notes were in the mail in transit for such delivery upon said day. The escrow trustee, McNabb, had notice and knowledge of these facts, both as a member of the creditors' committee, and through his presence in the office of the chairman of said committee, upon the morning of the day in question, when the notes and obligations as delivered and called for were checked up. Thus, although three days remained, under the terms of the escrow agreement, for performance by plaintiffs of the conditions thereunder imposed upon them, they had already, so far as possible, discharged the burden of performance which rested upon them. Their consents had been delivered to the appointed agent. Their notes had been delivered or were in the mail in transit for delivery as provided. Nothing remained to be done but delivery of the transfers to the new corporation, and delivery by the latter of the mortgage bonds with which to replace plaintiffs' debts. The performance of these steps cannot be said to have rested upon plaintiffs, but they were to be performed by the trustee, and by the corporation, of which appellants were a part, before anything further was to be done by the creditors. We think, therefore, that there was such a compliance by the plaintiffs with the conditions under which appellants' transfers were deposited as gave the former vested and enforceable rights in such transfers, and prevented appellants from withdrawing the same.

We come finally to the remaining and more complicated question raised by the contention of appellants, that the minds of the parties never met in an agreement sufficiently definite and complete to form the basis of this action for specific performance, and to compel the delivery of appellants' transfers and assignments as part performance thereof. In support of this, it is urged, in the first place, that the

letter issued by the creditors' committee under date of November 27, 1901, was a mere informal and tentative suggestion of a plan of settlement of the difficulties in which the parties found themselves, and which, if received with favor, was thereafter to be followed by a formal and original agreement; and in the second place it is said that, if this last proposition is unsustained, still many details were left incomplete, and never fixed and defined, up to the time when this action was brought.

We disagree with this contention in both of its branches. Appellants' counsel has referred to the circumstances which attended the issuing of this letter of November 27th, and to many phrases used therein, tending to support, as claimed, his position. It is impossible, within reasonable limits, to take up and review all of these circumstances and expressions. We think that a consideration of the entire instrument, sent out, as it was, with the approval and concurrence of the appellants, duly manifested by their written instrument, justifies the conclusion that it was a proposition in their behalf of settlement, which when accepted by their creditors ripened into an agreement setting forth the general features of a plan of adjustment, although still leaving various minor features to be settled.

In considering the second branch of appellants' contention, that no completed agreement was ever reached, we are to test its correctness by the facts as they existed when appellants' transfers were delivered, upon January 18, 1902. It may be conceded for the sake of argument that if the efforts and negotiations of the parties had ceased with the issue of the letter of November 27th there would not have been a sufficiently completed agreement to sustain this action. But after that the creditors, through a committee of their number, and the appellants seem to have steadily maintained negotiations for perfecting the details of the plan of adjustment of indebtedness. We think that, when appellants deposited their transfers with McNabb upon the evening of January 18th, this was done in pursuance or as part of an agreement which at that time had been perfected in all of its essential details.

Here, again, it is impossible to follow and comment at length upon all of the steps and negotiations of the parties. It is perfectly apparent that the one feature of the plan of adjustment which in the minds of the parties overshadowed all others in importance was the organization of the corporation which was to act as the medium of carrying out the agreements of the parties. Practically all of the essential features of the settlement of the indebtedness between the parties were to be performed by means of this corporation. And in reference to the latter, again, the delicate question over which the parties much contended was as to the organization of its board of directors, each side being sensitive as to its representation therein. Finally this was agreed upon, and a certificate of incorporation duly executed at the same time with appellants' transfers, which fixed the name of the corporation, the amount of its capital stock, the personnel of its board of directors, etc. This certificate, as stated, was actually executed, and thus disposed of and actually fixed many of the details of the plan between the parties. In addition to this, the parties by their various written instruments had agreed upon many details of the conduct of its business by

said corporation which might properly be the subject of by-laws which were to be executed by and for it. Thus, we find specific and most explicit arrangements as to the signing of checks, as to the methods of keeping its books, as to the duties to be discharged by the two former copartners, Roughead and Jones, and as to other matters. Provision was also made for the disposition of the capital stock to be issued, and which, as hereinbefore stated, was to be the compensation to Mrs. Jones and Roughead for the property transferred by them to said corporation.

But especial stress is laid upon the fact that the instrument of November 27th contained the statement that a number of carefully prepared provisions were to be incorporated into the agreements to safeguard and protect the interests of the creditors, and that sufficiently definite agreements were not reached between the parties for the form of the bonds and mortgage securing the same which were to be issued by the new corporation. So far as the first criticism is concerned, it might be answered that the carefully prepared provisions referred to were to safeguard and protect the interests of the creditors, and no creditors are complaining at the absence of such provisions. But, as we have already suggested, we think that the demand for these provisions was fully met by the agreements reached between the parties prior to January 18th, and that especially when the parties agreed upon the directors who were to have control of the corporation and its management they obviated any necessity for further provisions in this respect.

When we turn to the consideration of the bonds and mortgage to be executed we find that most of their details were absolutely and definitely fixed. They were to be executed by the new corporation. The mortgage trustee had been duly designated and agreed upon. The property to be covered by the mortgage was ascertained and fixed. The amount of the bonds was fixed by a reference to debts set forth and referred to in the original proposition of November 27th, and which were to be retired by the bonds. The terms of payment and the rate of interest were all fixed. It is suggested that the place of payment had not been designated, but, in the absence of such designation, we think that the general practice and the rules of law applicable to the payment of obligations would obviate any difficulty. Provision was made for the whole amount of the bonds becoming due in case the installment in any year was not paid. It is true that provisions for insurance, payment of taxes, funding of rents, payment of interest and current careing charges upon incumbered properties, and for the sale or exchange thereof by the mortgage trustee, for the release of the capital stock held by the mortgage trustee, and against undue expenditures for betterments or improvements pending the term of liquidation, were somewhat general. We think that this, if not necessary, was at least proper, and did not destroy the completeness of the agreement between the parties for the purposes of this action. Under the practice and the principles of law applicable thereto, the form of a corporation mortgage and bonds, and of the provisions usually and ordinarily inserted therein, like those for the payment of taxes and insurance, would be well understood and readily formulated. We think

that the parties contemplated that the exact details of these subjects should be left to the decision of the board of directors of the corporation, which they agreed upon. It was, in our judgment, essential that this should be done. Assuming that an agreement might have been made by the parties which would compel the directors of the corporation after they had been selected to place a certain amount of insurance upon the property, or agree not to exceed the expenditure of a certain amount in the course of 10 years for betterments or improvements, we think it would have been impossible to formulate such an agreement. Those were matters to be determined by conditions as they existed from time to time, and to be settled by the board of directors as presented. Substantially all that could be done by the parties was to make general provision, as they did, for the insertion in the mortgage or by-laws of clauses covering these different topics in appropriate manner. It is urged that, in the absence of more specific agreement, the appellants have surrendered all voice in the preparation of the bonds and mortgage. But the answer to this suggestion again is that the same could not be executed and issued except upon the vote of a board of five directors, two of whom were the appellants, and the third a man agreed upon by them.

Taking the view which we have expressed in regard to the facts of this case, the legal conclusion naturally follows that plaintiffs are entitled to the relief sought by them. The general principles which govern a court of equity in extending or withholding the relief of specific performance are neither intricate nor obscure. The difficulty in any instance must mainly arise in the application of well understood and established principles to the facts of that particular case. If, upon the evidence presented to us upon this appeal, we had been convinced that important and essential provisions of an attempted or purported agreement between the parties had been left undetermined, the case would at once have come within those authorities cited in behalf of the appellants where specific performance has been denied. A court of equity cannot make contracts in behalf of parties which they intend to make for themselves, and it is very obvious that such a court cannot enforce specific performance of a contract which has never been completed and made. Upon the other hand, assuming, as we have held, that the parties to this controversy did reach an agreement upon the essential details of the matters involved between them, the court had an undoubted right to grant relief in the form of a decree for specific performance. The completeness of the agreement between the parties for the purposes of this action was not, in our opinion, impaired by the fact that the execution of some of its details was remitted to the corporation agreed upon by the parties as the medium for such purpose.

We think that the judgment entered upon the report of the referee is subject to criticism in one respect. Concurrent with the delivery by plaintiffs of their notes and evidences of debt to Messrs. Roughead and Jones, the corporation organized by the parties was to issue bonds for such indebtedness secured by a mortgage upon the property conveyed by the instruments in escrow. The agreement of the parties provided that such mortgage should contain certain clauses with ref-

erence to insurance, taxes, etc. The judgment entered provides simply that the bonds should be secured by a mortgage upon the property in question. We think these clauses should be so modified as to provide that the mortgage securing the bonds in question should contain the various clauses and conditions agreed upon by the parties. As so modified, the judgment should be affirmed, with costs.

Judgment modified, and as so modified affirmed, with costs. Form of order and decision to be settled before HISCOCK, J., upon two days' notice. All concur.