UNITED STATES of America, Plaintiff,

v.

BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and Samuel Ades, Individually and as partners of Bedford Associates, and Amcar Management Corp., Defendants,

and

The Bowery Savings Bank, Intervenor.

The BOWERY SAVINGS BANK, Plaintiff,

v.

BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and Samuel Ades, Individually and as partners of Bedford Associates, and United States of America, Defendants.

Nos. 79 Civ. 1522 (HFW), 79 Civ. 1482 (HFW).

United States District Court, S. D. New York.

May 24, 1980.

William M. Tendy, U. S. Atty., S.D.N.Y., New York City, for the U. S.; William J. Brennan, Harvey J. Wolkoff, Asst. U. S. Attys., New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Bedford defend-

ants; Frank H. Wohl, Eugene Zemp Du-Bose, Jr., New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for Bowery; Terence F. Gilheany, Howard R. Hawkins, Jr., New York City, of counsel.

## OPINION

WERKER, District Judge.

These two consolidated actions arise from the Internal Revenue Service's (the "IRS") occupancy of a 21-story office building located at 120 Church Street owned by the defendant Bedford Associates.[1] The plaintiff-intervenor Bowery Savings Bank ("Bowery") is the holder of a consolidated first mortgage on the premises. These actions having been tried on the merits before the Court on March 17–20 and 24–26, 1980, and all of the evidence having been duly considered, judgment is rendered in favor of Bedford in action no. 79 Civ. 1522 and in favor of Bowery in action no. 79 Civ. 1482. Pursuant to Fed.R.Civ.P. 52(a), my findings of fact and conclusions of law follow.

## FACTS

In 1962, the United States General Services Administration ("GSA") executed a lease of the premises with Bedford for a ten-year term commencing on November 1, 1963, with two five-year renewal options. The IRS remained in continuous occupancy of the building for the initial ten-year period. On October 25, 1973, the Government exercised its first renewal, subject to the approval of Congress, which was obtained for both the first and second renewal options in December 1973. The IRS remained in continuous occupancy under the first renewal option through October 31, 1978. The Government did not exercise its second renewal option, and the lease expired on October 31, 1978. PTO, Agreed Findings 4–6.[2]

### A. The Solicitation for Offers

During the course of the first five-year renewal period, the Government determined that 120 Church Street no longer met the needs of the IRS and determined to lease improved space. PTO, Agreed Finding 6. After conducting market surveys, on June 28, 1977 GSA sent a Solicitation For Offers (the "Solicitation") to 12 prospective lessors, including Bedford. The Solicitation provided, *inter alia*, that all offers with an annual rent in excess of $500,000 were required to remain open for 240 days from the last date of receipt of offers by GSA. PTO, Agreed Finding 7; HX 12 (A. 722). The Solicitation called for offers of 317,000 net usable square feet, plus an option on an additional 8,000 net usable square feet, which space was to be contiguous. HX 12 (A. 734). A method for computing net usable square feet was set forth in the Solicitation. *Id.* (A. 788).

### B. The Negotiations

On August 15, 1977, the last date for receipt of offers, GSA received three offers in response to the Solicitation, one of which was from Bedford. PTO, Agreed Finding 8. The other two offers were submitted by the Port Authority of New York and New Jersey (the "Port Authority") for space in the World Trade Center and by the Prudential Insurance Company of America ("Prudential") for space at 100 Church Street. *See* HX 186 (A. 1234); HX 188 (A. 1276). Thereafter, GSA entered into negotiations with the three offerors concerning their respective offers. HXs 187, 189, 190 (A. 1268, 1333, 1345).

#### (1) Bedford's Offer and the Purported Competition

Bedford's original offer in response to the solicitation was economically viable when

---

1. Bedford Associates is a partnership consisting of the defendants Doris K. Carver and Samuel Ades. The building is operated and maintained by the defendant Amcar Management Corp. ("Amcar"). Bedford Associates, Carver, Ades and Amcar will hereinafter be collectively referred to as "Bedford."

2. "PTO" refers to the consent pretrial order dated March 17, 1980. "HX" refers to exhibits introduced at the preliminary injunction hearing. "A." refers to the appendix on the appeal of this Court's preliminary injunction order. "GX" and "DX" refer to the Government's and Bedford's exhibits introduced at trial, respectively.

made and was made in good faith with the expectation that Bedford would retain ownership of the building. Tr. 373, 381, 412–13 (D. Carver); tr. 628, 651–52 (M. Madonick); tr. 812–19 (C. Madonick).[3] Bedford offered the entire building, plus an additional 8,873 square feet at 110 Church Street, for a total of 350,024 square feet at $3,073,210.72 per year, including electricity, or approximately $8.78 per square foot. HXs 15, 16 (A. 799–811); DX 275. The offer also included approximately $1 million worth of construction. A. 223 (M. Madonick). See HX 16 (A. 811); HX 18 (A. 814–16).

The Port Authority and Prudential offers called for rents substantially higher than that provided for in the Bedford offer. The Port Authority offer was for noncontiguous space at $14.41 per square foot, substantially excluding electricity. The Prudential offer was for 317,000 square feet at $12.07 per square foot, excluding electricity, and exceeded the limitation set forth in the Economy Act. HX 119 (A. 1032); tr. 64 (Beck). The space referred to in these two offers may have been more attractive than 120 Church Street; however, because of the noncontiguous space of the Port Authority offer, the violation of the Economy Act of the Prudential offer, and the comparatively high rents of both, these offers were not competitive with the Bedford offer.

The Solicitation provided that there would be no public opening of bids and that all offers would be kept strictly confidential until an award was made. HX 12 (A. 722). GSA did not disclose the identities of the other offerors to Bedford during the negotiations. However, GSA did represent to Bedford that there was competition and used the existence of other offers as leverage in its negotiations with Bedford. See HX 190 (A. 1350, 1351) (memorandum of 11/2/77 meeting: GSA "stressed need to be competitive," "noted the competition . . that is actively and strenuously after this lease"), (1352–53) (memorandum of 11/7/77 meeting), (1354) (memorandum of 11/9/77 meeting), (1358) (11/28/77 memorandum).

See also A. 406 (M. Carver); tr. 82–83 (Beck) (GSA wanted to give the impression that the other bids were competitive). As late as November 28, 1977, after GSA had determined to recommend the Bedford offer, and after it had become clear that the other offers were not competitive, GSA was still referring to "other offers" in its negotiations. HX 190 (A. 1358). The Prudential representatives had advised GSA on November 22, 1977 that Prudential's best offer had been made, that its offer could not be reduced to meet the Economy Act limitation. In fact, the Prudential representatives at that meeting asked to be notified "as soon as possible as to when [Prudential could] be released from [its] offer." HX 189 (A. 1342).

Although the Prudential offer was net of utilities and the Port Authority offer was substantially net of utilities, GSA advised Bedford that it could not and would not consider offers net of utilities. A. 287, 321–23 (M. Madonick). GSA also told Bedford during the course of negotiations that the other offerors were offering new ceilings and persuaded Bedford to offer new ceilings as well. A. 96 (Margolin); A. 232 (M. Madonick); HX 18 (A. 816).

(2) Rent During Construction

At the time GSA commenced its search for improved space, it anticipated that the entire process of negotiating, obtaining congressional approval and making an award would be completed by April 1978. Because the IRS was supposed to be relocated by November 1, 1978, it was important that this schedule be met. DX 208; tr. 138–39 (LeDuc). Although Bedford was told by GSA on a number of occasions that no one could predict with certainty when congressional approval would be obtained or when an award would be made, tr. 45–46 (Beck); tr. 127 (LeDuc); A. 78–79 (Margolin), Bedford reasonably believed that an award under the Solicitation would be made by the end of 1977 or within the first few months of 1978. The Solicitation called for occupancy by November 1, 1978, HX 12 (A. 734),

---

3. Bedford did not begin to consider selling the building until December 1977 or January 1978.

Tr. 644 (M. Madonick); see also tr. 825–26 (C. Madonick).

and Bedford knew that the Government wanted the new space by that date. A. 401–04 (M. Carver); tr. 618–19 (M. Madonick). Bedford's offer in response to the Solicitation included a construction package, and it had planned on beginning construction by early 1978. Tr. 620 (M. Madonick); tr. 337–39 (M. Carver). The Government was aware of the fact that Bedford wanted to start construction early in 1978. A. 234, 363–64 (M. Madonick); see also HX 21 (A. 823).

On November 18, 1977, Bedford wrote to GSA that it anticipated that a number of floors would be completely renovated prior to "the November 1st, 1978 commencement date of the new lease." HX 21 (A. 823).[4] Bedford proposed that in the event floors were not renovated by November 1, 1978, the Government would pay the rent called for under the second renewal option to the 1962 lease for all unrenovated floors on a pro rata basis. HX 21 (A. 823). As the delays in the processing of the proposed lease occurred, it became apparent to Bedford that the renovations were not going to proceed as quickly as anticipated and that consequently the rent it would be receiving after November 1, 1978 under the November 18, 1977 proposal would be much lower than it had anticipated. See A. 406–07, 411 (M. Carver); A. 431 (D. Carver). The delay in the making of an award threw the construction schedule off, and the resultant increases in construction costs rendered Bedford's bid no longer viable. A. 411–13 (M. Carver); tr. 617–20 (M. Madonick); HXs 30–35 (A. 836–41).

On March 2, 1978, Bedford proposed in writing to GSA that it pay the first renewal option rent and all utilities until the completion of construction or 18 months after the execution of the new lease, whichever came first, with the rent under the new lease to begin then. HX 25 (A. 830). Although GSA privately decided to reject this proposal, HX 175 (A. 1214) ("We don't want it"), Bedford was advised by letter dated April 5, 1978 that the proposal could be considered at a later time. HX 26 (A. 832); see also A. 248–49, 251 (M. Madonick). Bedford reasonably believed that this proposal would be negotiated with the Government after the award was made. A. 255 (M. Madonick); see DX 234. Bedford had been advised by GSA that an award letter was "in essence, a letter of intent by the United States Government," tr. 622 (M. Madonick), and, as Margolin himself testified, Bedford was told by GSA "to reserve all further changes" until after an award was made. A. 72–73. The March 2, 1978 proposal also made it clear that Bedford was withdrawing the November 18, 1977 proposal: the March 2d letter plainly stated, "As per our meetings and discussions, we propose the following as the terms of rental during the construction period." HX 25 (A. 830).

#### (3) Square Footage

Bedford's original offer in response to the Solicitation called for a total of 350,024 square feet at $3,073,210.72. Some 311,727 square feet of this space was office space, and the balance of 38,297 square feet was storage space, 29,424 square feet at 120 Church Street and 8,873 square feet at 110 Church Street. HX 15 (A. 799). As a result of negotiations, the rental and footage figures underwent a number of changes. By December 8, 1977, the proposed rent had been reduced to $2,980,400 for 282,000 square feet of office space, 35,000 square feet of storage space, plus the optional 8,000 square feet of office space.[5] The provision for storage space at 110 Church Street was eliminated. HX 22A (A. 825). A subsequent amendment reduced the proposed rents for the two five-year optional renewal periods. HX 24 (A. 828). These reductions resulted from GSA's representations that Bedford had strong competition, from GSA's indications that it would if necessary

---

4. In contrast, the Solicitation provided that "[d]etermination of the commencement date shall be made after full occupancy of the space has been completed." HX 12 (A. 783).

5. Bedford had initially proposed an increase in rent to $3,318,227 as a result of the increased cost of construction. HX 18 (A. 817) (attachment # 3 to letter dated 11/1/77); tr. 628–30 (M. Madonick).

exercise the second renewal option under the 1962 lease, and from GSA's claim that Bedford's offer had "quite a bit of fat" in it. HX 190 (A. 1350). This last claim was made despite GSA's knowledge that Bedford was seriously underestimating its operating costs. HX 191 (A. 1385).

Bedford originally offered all of 120 Church Street. However, when its offer was subsequently amended so that the Government would only be occupying 325,-000 square feet under the new lease, including the optional 8,000 square feet, Bedford believed that there would be one or two floors of vacant space in the building after October 31, 1978. Tr. 632-35 (M. Madonick); A. 262-63 (M. Madonick). GSA also believed that there would be space left over in the building under the proposed new lease. On May 6, 1977, GSA had written that the building contained 333,120 net usable square feet "based on current measuring criteria." DX 207, at 2. The Solicitation called only for 325,000 net usable square feet, including the optional 8,000 square feet. At a June 1977 meeting between IRS and GSA, prior to the issuance of the Solicitation, it was indicated that 120 Church Street contained more space than IRS was then occupying, and that consequently the upper floors would probably not be necessary. DX 209. The Government was given "the right to select the floors it [would] occupy," DX 214; see also HX 190 (A. 1351), and GSA acknowledged to Bedford that possibly one or two floors would not have to be renovated because the Solicitation was for 282,000 square feet. HX 190 (A. 1351). By December 9, 1977, however, the IRS had apparently decided that it wanted the entire building. DX 215.

During December 1977 and January 1978, Bedford and GSA had a number of discussions concerning the square footage of 120 Church Street. On January 31, 1978, Ed Spitzer met with Mike Madonick and measured the floor plans. The two were in substantial agreement as to the measure-

ments of the building, but because they did not agree on the applicability of the 10 per cent corridor reduction factor, they were not in substantial agreement as to the net usable square footage. Tr. 633-35 (M. Madonick); see tr. 277-78 (Spitzer).[6] Bedford did not believe the corridor deduction factor was applicable because the proposed remodelling called for "open landscaping," space which does not require fixed corridors. Tr. 633-35, 665-66 (M. Madonick); see also tr. 824 (C. Madonick).

### (4) Overtime Services

The Solicitation provided that overtime services would be furnished by the lessor at the Government's request at rates to be agreed upon. HX 12 (A. 726, 774). Although Bedford proposed overtime rates, HX 18 (A. 818), the parties never did reach an agreement as to the rate the Government would pay for overtime services. HX 38 (A. 854); DX 234; A. 325-26 (M. Madonick). The cost of overtime services was a significant expense, having cost the Government at least $90,000 per year for several years prior to and including 1975. HX 10 (A. 716).

### (5) The Second Renewal Option

Under the provisions of the 1962 lease, GSA's right to exercise its second renewal option was to expire on or about May 1, 1978, 180 days prior to the expiration date of the first renewal of the lease. The notice provision of the lease provided for notice of renewal "at least 180 days before this lease or any renewal thereof would otherwise expire." HX 1 (A. 677). Although two 1973 amendments to the lease, made at the Government's request, reduced the renewal notice period first to 90 days and then to 30 days, these amendments did not refer to renewal of any renewal of the lease. HXs 2, 3 (A. 692, 693). At the time these amendments were made, there was no discussion of extending the renewal notice period for the second five-year option. Tr. 415-16 (D. Carver). The 1973 extensions were granted because GSA needed the addi-

---

6. GX 527 contains the entry 356,822.7 with the notation "RENTAL AREA; NOT DEDUCTING FOR CORRIDORS."

tional time to obtain approval from Congress for exercising the renewal options. A. 47 (Margolin). Since Congress approved both renewals in 1973, the reason for extending the notice period did not exist in 1978. The 1973 amendments thus did not affect the renewal notice period for the second renewal option, and the Government's time to exercise the renewal had indeed expired on or about May 1, 1978.

GSA, however, was apparently under the impression that it could renew the lease up to 30 days prior to the expiration date, and in September of 1978 it requested a waiver of the notice requirement. Tr. 38 (Beck). Michael Madonick and Dewey Carver advised GSA that it was Bedford's position that the second renewal option had already expired. Sidney Beck advised Dewey Carver that if a waiver were not granted, GSA would nevertheless seek to exercise the second option. Beck further told Dewey Carver that if Congress approved the proposed new lease, the second renewal would not be exercised. To avoid difficulties and a possible lawsuit, and because of Beck's assurances that the second renewal option would not be exercised if congressional approval was obtained, Dewey Carver reluctantly "waive[d] the 180 day notice to renew and grant[ed GSA] the right until October 31, 1978, to exercise the [second] option to renew . . . ." HX 36 (A. 844); see tr. 39–40 (Beck); A. 427–29 (D. Carver).

The Government's efforts to obtain a waiver of the renewal notice requirement were made in spite of the fact that it had decided, long before these efforts were made, not to exercise the second renewal option. See, e. g., DX 206 (IRS letter dated 3/22/77); HX 11 (A. 720) (GSA memorandum dated 6/2/77); DX 216 (draft prospectus attached to GSA cover letter dated 12/16/77). Although GSA representatives may have told Bedford on a number of occasions that the Government would exercise the second option in the event suitable improved space was not found, see, e. g., HX 190 (A. 1350); A. 181 (Margolin); tr. 12, 14–15 (Turetsky), the Government would not have actually done so. A GSA memorandum dated April 1, 1977 stated that if a

satisfactory site for the IRS were not found by September 30, 1978, the Government would stay at 120 Church Street as a holdover tenant rather than exercise the second renewal option. DX 206. Exercising the second renewal option was simply not an acceptable or viable alternative, for it was "just about . . . impossible" for the IRS to function efficiently at 120 Church Street without renovations and improvements. A. 61 (Margolin); see also DX 206 (IRS letter dated 3/22/77: "[S]everal years ago, we were forced into accepting a 5-year renewal . . . . We do not intend for this to happen again. . . . "[W]e do not want GSA to enter into a 5-year renewal at our present location in October 1978.-"); DX 211 (GSA memorandum of 11/4/77 meeting with IRS: "IRS noted it does not want to renew the current lease").

GSA knew that exercising the second renewal option would result in financial disaster to Bedford. A. 401 (M. Carver). GSA was told that renewal would cause ownership to lose the building, HX 190 (A. 1350), and it knew that the renewal rent would not cover ownership's debt service, much less provide for a return on the investment. See HX 191 (A. 1377) (renewal rent would leave $117,704 for mortgage indebtedness, interest, return on investment); HX 52 (A. 1002–03) (interest expense exceeded $600,-000 yearly); HX 53A (A. 1018) (GSA calculated Bedford's annual loss under renewal rent to be over $600,000). See also A. 180 (Margolin); tr. 21 (Turetsky); tr. 62 (Beck).

### (6) The Government's Requests for Extensions

By letters dated February 28, June 6, 14, July 25, August 30, and September 22 and 27, 1978, Bedford granted the Government's requests for extensions of the time within which the Government could accept Bedford's offer until October 31, 1978. HXs 29, 30, 31, 32, 33, 34, 35 (A. 835–41). In these letters, Bedford emphasized the economic hardship it was sustaining because of these delays, and expressed the hope that this fact would be recognized by GSA in negotiations. Bedford reasonably believed that

the terms of its offer would be renegotiated following an award to compensate it for the economic injury it was suffering by reason of the Government's delays. A. 409–10 (M. Carver); 641–43 (M. Madonick); tr. 389, 391 (D. Carver); tr. 826–29, 837 (C. Madonick); A. 455–59 (C. Madonick); *see also* GX 510, 511.

### (7) Termination of Negotiations

Negotiations between GSA and Bedford regarding the latter's offer formally commenced on August 25, 1977. HX 190 (A. 1345). During the course of the negotiations, Bedford submitted ten letters of change to its original offer, dated September 6, 1977, November 1, 10, 15, 17, 18, 28, 1977, December 8, 1977, January 31, 1978, and February 1, 1978. HXs 16, 17, 18, 19, 20, 21, 22, 22A, 23, 24 (A. 811–29). Additional letters submitted by Bedford from February 28, 1978 onward must also be considered to have revised or supplemented Bedford's original offer. HXs 25 (A. 830), 29–37 (A. 835–48). The negotiations did not cease in February of 1978, as alleged by the Government, but continued until after November 1, 1978. *See, e. g.*, DX 218 (GSA mem. dated 2/23/78); DX 230 (GSA mem. dated 8/15/78); GX 511 (letter on behalf of Bedford dated 9/14/78); DX 235A (GSA mem. dated 10/6/78); GX 556 (GSA mem. dated 10/26/78); DX 243 (handwritten GSA notes dated 12/29/78 through 1/10/79). *See also* tr. 642–43, 676–79 (M. Madonick); A. 276–82 (M. Madonick) & HXs 176 (A. 1215–16); A. 331–32 (M. Madonick) & HXs 177, 178 (A. 1217–18); A. 384–87 (M. Madonick). Although GSA may have considered negotiations closed as of February 2, 1978, see A. 68, 112–13 (Margolin); tr. 50–51 (Beck); tr. 180–82 (LeDuc); it did not give Bedford advance written notice of termination of negotiations as required by the GSA handobok on the acquisition of leasehold interests in property, DX 248, chap. 3–18, at 24, and also by 41 C.F.R. § 1–3.805–1(b). The April 5, 1978 letter purporting to provide written notice of termination of negotiations, see A. 113 (Margolin), was sent two months after negotiations had allegedly been terminated. HX 26 (A. 832). Moreover, although the letter

states that GSA was in no position "to consider any revision of the terms and conditions of the Solicitation," it left the door open for further negotiations by stating:

> We believe your new proposal needs additional detail and amplification for us to come to a conclusion. If your proposal can be justified as economically and otherwise in the best interest of the Government, it will be submitted to our Central Office for approval, after an award is made.

HX 26 (A. 832).

### C. *The Proposed Lease*

By November 1977, GSA had concluded that it would recommend making the award to Bedford. DXs 212, 213, 214. The New York office of GSA did not forward its recommendation to GSA in Washington until April 1978. Tr. 72 (Beck). A draft prospectus was sent to Washington on December 16, 1977, DX 216, but the final prospectus was not sent to Congress until June 1978. HX 118 (A. 1028). Although six months elapsed between the submission of the two prospectuses, there is no substantial difference in their contents.

Congressional approval was granted by October 4, 1978, HX 27 (A. 833), and an award letter purporting to accept an offer made by Bedford was delivered to Bedford on October 30, 1978. PTO, Agreed Findings 11, 12; HX 28 (A. 834). A copy of the award letter was received by Bowery on October 30, 1978. PTO, Agreed Finding 13. The award letter purported to lease 282,000 net usable square feet of office space and 35,000 net usable square feet of storage space, with an option to lease an additional 8,000 net usable square feet of office space. HX 28 (A. 834). The letter also stated that the "Government anticipates it may occupy the entire building. . . ." *Id.* On December 3, 1978, GSA tendered a proposed lease to Bedford. PTO, Agreed Finding 16; *see* HX 38 (A. 849); HX 39 (A. 965).

In response to the award letter, Bedford wrote that it could not proceed with the proposed construction and requested that

the new rental be paid notwithstanding the fact that the construction had not yet commenced. HX 131 (A. 1059). By letter dated December 15, 1978, Bedford formally rejected the proposed lease, stating:

The lease as prepared by [GSA] is completely unacceptable to ownership. The provisions contained in the lease do not reflect, nor are they consistent with the solicitation and award.

HX 40 (A. 966). The letter further stated that Bedford was prepared to "negotiate a lease which is fair and acceptable to all parties." *Id.; see also* HX 132 (A. 1060) (Bedford letter dated 12/11/78: check for November 1978 rent accepted "under protest"). The Government, in response, maintained that the Solicitation, Bedford's offer as amended, and the award constituted a binding contract and urged Bedford to fulfill its obligations. HX 41 (A. 967–69).

The new "lease," as alleged by the Government, purported to incorporate Bedford's November 18, 1977 letter. Under this new "lease," because no floors had been renovated by November 1, 1978,[7] Bedford would only have been entitled to receive the second renewal option rental while being required at the same time to pay increased costs of some $400,000 per year in utilities[8] and to commence some $3.8 million worth of construction. *See* HX 191 (A. 1377). These obligations would have been even more onerous than those that would have been imposed under the second renewal option alone. The second renewal option rent was $2,226,194, or approximately $6.85 per square foot per annum, using the Government's figure of 325,000 square feet. This rental was thus substantially below GSA's appraised Fair Annual Rental of $11.86 per square foot, HX 191 (A. 1376), and its

SLUC rate, or standard level user's charge, of approximately $13.00 per square foot. Tr. 603–04 (Burke). Carl Madonick testified that GSA told him in early 1978 that GSA was charging the IRS $11.14 per square foot for 120 Church Street.

According to the Government's own estimates, the alleged new "lease" would result in extreme hardship to Bedford. A GSA staff appraisal indicated that the rent under the second option would leave Bedford with only $117,704 for mortgage indebtedness and interest and return on capital. HX 191 (A. 1377). A GSA audit completed in January 1979 estimated that under the new lease after construction Bedford would lose some $521,616 annually. HX 50A (A. 1017).

#### D. *Bowery's Mortgage*

Bowery's mortgage on the premises, as amended on or about August 1, 1975, provided that Bedford would continue negotiations with the United States for the leasing of the premises on terms more favorable than the 1962 lease, and that such terms must meet with the approval of Bowery before acceptance thereby by Bedford, such approval not to be unreasonably withheld. PTO, Agreed Finding 14; *see* HX U, at ¶ 25 (A. 1525). Bowery's right to approve any new lease was a matter of public record, *see* HXs M–U (A. 1480–520), and the Government was aware of the existence of Bowery's mortgage at least as early as 1972. A. 159 (Margolin); HX 52 (A. 992, 996); tr. 99 (Beck). Moreover, in 1975 Carl Madonick told GSA that Bowery had the right to approve any new lease entered into between Bedford and the Government. Tr. 522–26.

---

**7.** In December 1975, the Government and Bedford had entered into a supplemental agreement to the 1962 lease whereby Bedford released the Government from any claims for excess electricity and agreed to and did make alterations on four floors of the building, and in consideration whereof the Government agreed to and did assume the cost of all utilities for the balance of the first renewal term. HX 10 (A. 703). Although the four renovated floors only needed additional minimal work, they did not

meet the requirements of the Solicitation and thus were not considered to be "completely renovated" for purposes of the November 18, 1977 proposal. *See* tr. 95–96 (Beck); *but see* HX 190 (A. 1351).

**8.** The Government had been paying for all utilities in accordance with the December 1975 supplemental agreement. *See* note 8 *supra*. Under the alleged new lease, Bedford was to pay for all utilities other than excess electricity.

Bowery did not receive a copy of the proposed lease until January 1979, when Follis of Bowery requested and received a copy from Spitzer of GSA. A. 442–43 (Marini); tr. 506 (Follis). In August of 1977, Carl Madonick had advised Bowery that Bedford was submitting a bid to the Government for a new lease on 120 Church Street. At that time, he provided Bowery with a copy of the first page of Bedford's bid. A. 482, 512–13 (C. Madonick); tr. 488 (Follis). On 29, 1978, Carl Madonick wrote to Bowery and informed it of some of the terms of Bedford's bid. GX 509. By September 1978, Bowery had received sufficient information to make some initial calculations regarding the financial advisability of the terms proposed by Bedford's bid. Although Bowery personnel did conclude on the basis of the information then available to it that the lease then proposed would be unacceptable, tr. 459–66 (Babyak); tr. 495, 499 (Follis), this conclusion was a preliminary one based on figures which the Bowery personnel believed would be further negotiated. Bowery's understanding, from September 1978 onward, of the Solicitation, Bedford's offer, and an award was that these would serve as basis for negotiating a lease, and that only the lease would constitute the binding agreement between the parties. In a letter dated September 14, 1978, Carl Madonick advised Bowery that "[o]n the basis of the award, lease negotiations will be entered into between the parties and when consummated the lease is the binding agreement." GX 511. A Bowery file memorandum dated September 7, 1978 states that "[a]t this stage, everything is a bid and the actual lease will have to be negotiated." GX 510. Bowery was under the impression that a number of items had not yet been resolved, such as square footage and who would pay for utilities, items which Bowery believed were just as important as a rental figure since these items would bear heavily on the profitability of the building. Tr. 493–94, 502–05 (Follis).

On April 4, 1978, Bedford received $207,-194.87 as a tax refund from tax certiorari proceedings for the years 1974–75, 1975–76 and 1976–77, which Bedford did not pay to Bowery. As of March 1, 1980, the total principal amount due and payable under Bowery's first mortgage was $10,222,096.03, the total interest accrued and payable thereunder was $2,372,376.66, and real estate tax and water and sewer arrears (liens prior to the lien of Bowery's first mortgage and due and payable under that mortgage) totalled $784,627.22. Bowery's first mortgage is presently in default and has been in default since prior to the commencement of Bowery's action on March 21, 1979. Bedford's failure to pay the accrued interest and real estate tax and water and sewer arrears set forth above, together with applicable late charges, constitute acts of default under the first mortgage. PTO, Agreed Findings 18–20.

By commencement of its action on March 21, 1979, Bowery elected to and did declare the entire principal sum of its first mortgage to be in default and to be immediately due and payable. Bowery Complaint ¶ 44. Because of Bedford's default under the mortgage, Bowery presently holds an assignment of all rents from the premises. HX U, at ¶ 14 (A. 1523–24).

### E. *The Instant Proceedings*

By letter dated March 20, 1979, Bedford informed GSA that it would "terminate all services, including electricity, in 120 Church Street at 6:00 P.M. on March 23, 1979 and close the building" unless the United States paid a "reasonable and fair rent" for its continued occupancy. PTO, Agreed Finding 17. The Government filed suit on March 22, 1979, and moved that same day for a temporary restraining order and a preliminary injunction enjoining Bedford from closing and terminating services to the building. After the Government amended its complaint to add a count alleging the existence of a valid lease, a temporary restraining order was granted with Bedford's consent. Bowery was granted leave to intervene. A preliminary injunction hearing was held between March 28 and April 4, 1979, at the conclusion of which the Court issued a preliminary injunction in favor of the Government against Bedford on the conditions that the rents be paid to

Bowery and that the Government pay the rent due under the second renewal option plus all utilities without set-off. On appeal, the second circuit affirmed the Court's conditioning the granting of injunctive relief on the Government's performance of a condition precedent, but remanded with instructions that the injunction be modified to provide for payment by the Government of the second renewal rental plus $12,278.64 per month on account of completed renovations plus $14,000 per month on account of excess electricity consumption. *United States v. Bedford Associates*, 618 F.2d 904 (2d Cir. 1980).

The Government seeks, in addition to injunctive and declaratory relief, damages for injuries it allegedly sustained as the result of Bedford's purported breach of the alleged lease. Bedford's amended answer, filed July 30, 1979, denied the existence of a lease, and argued that even if a lease contract had been created, it was unenforceable. The amended answer also set forth a counterclaim for the fair market rental value of the building.

Bowery's suit was filed on March 21, 1979 for a declaratory judgment quieting title, foreclosure of its mortgage, and an assignment of rents. Bedford's answer set forth the affirmative defenses of lack of subject matter jurisdiction and laches and counterclaimed for payments from the rents which Bowery was by court order collecting. The Government moved to dismiss the complaint for lack of subject matter jurisdiction, and the motion was denied in my opinion dated March 18, 1980. The Government's answer was not filed until April 7, 1980; it raised, *inter alia*, the affirmative defenses of unclean hands and waiver.

These cases, having been consolidated in April 1979, were tried together in March 1980, and the parties thereafter submitted proposed findings of fact.

By letter dated April 18, 1980, Bowery moved to strike the Government's defenses of unclean hands and waiver on the ground that the defenses have been waived by the Government's failure to assert them in a timely fashion. By letter dated May 6, 1980, the Government moved to strike certain proposed supplemental findings of fact filed by Bedford on the ground that they were not submitted in a timely manner. Since these actions are essentially equitable ones, and because of the expedited manner in which these cases were brought to trial, both of these pending motions are hereby denied. The merits will be reached on all claims.

## DISCUSSION

The principal issues before the Court are (1) whether the Government and Bedford entered into a valid lease agreement, (2) whether, assuming a lease agreement was made, the agreement is enforceable, and (3) whether Bowery is entitled to foreclose its mortgage. In the event a judgment of foreclosure is rendered, the question of valuation of the property must also be addressed.

### A. The Alleged Lease Formation

 Negotiations and preliminary agreements do not constitute a contract "if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form." Restatement (Second) of Contracts § 26, Comment B (tentative draft no. 1, 1964). As the second circuit has observed, "the crucial question is whether the parties intended not to be bound, or whether either of them manifested an intent to the other not to be bound, until a fully integrated contract had been executed." *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir. 1958). If there is no "meeting of the minds" on all of the essential terms or if some of the essential terms are too indefinite, there is no contract. *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676–77 (2d Cir. 1972); *V'Soske v. Barwick*, 404 F.2d 495, 500 (2d Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

The record clearly demonstrates that Bedford did not intend to be bound until the entire leasing agreement was completed and reduced to a fully integrated contract. Bedford reasonably believed that a number of items had simply not yet been resolved, and further, that the terms of the original offer would be renegotiated to take into account the damages it had sustained as a result of the Government's delays in processing its offer. More specifically, Bedford reasonably believed that its utilities exchange proposal, the square footage being rented, the rates for overtime services, and adjustments to compensate Bedford for the increased construction costs caused by the Government's delay were matters to be further discussed following an award and prior to the signing of a lease. It was also Bowery's understanding that a number of items would be further negotiated after an award was made. Bedford's intent not to be bound and its belief that terms would be renegotiated after an award was made were manifested to the Government. Although the Government did on a number of occasions advise Bedford that negotiations were closed, it frequently indicated that the matters could and would be discussed after an award. The Government in effect advised Bedford that while the terms of the proposed lease could not be further negotiated pending congressional approval, the terms would be discussed once congressional approval was obtained and an award made. Hence, negotiations were not in fact closed.

It had become apparent to Bedford as early as March 2, 1978 that its offer was no longer economically viable in light of the delays in obtaining an award, and it therefore made its utilities exchange proposal. Although the Government may have privately rejected the proposal, it advised Bedford, in effect, that it was deferring a decision on the proposal, and led Bedford to believe the matter would be raised after an award. Had Bedford not believed that this proposal and other terms of the contract would be discussed further after an award, it would not have continued to grant the Government extensions of time in which to accept an offer it knew was no longer eco-

nomically feasible. Bedford clearly did not intend to be bound until the outstanding items had been resolved.

It is also clear that the Government and Bedford did not reach an agreement on a number of material terms. There was no meeting of the minds as to the rent to be paid during construction. The November 18, 1977 proposal was based on Bedford's assumption that the commencement date of the new rental figure would be November 1, 1978. The Government, on the other hand, believed that the "commencement date" would not be determined until after "full occupancy ha[d] been completed." A. 783. In any event, the November 18, 1977 proposal was clearly withdrawn by the March 2, 1978 utilities exchange proposal. GSA's April 5, 1978 letter deferred a decision on the utilities exchange proposal, and the matter was never finally resolved. Bedford and GSA were also not in agreement as to the portion of the building the IRS would be occupying. The award letter stated that the "Government anticipates it may occupy the entire building . . . ." HX 28 (A. 834). Bedford originally offered the entire building, but when it subsequently reduced the proposed rental it also reduced the footage and believed that one or two floors would be left over which it could rent for additional income. Although Bedford and GSA were substantially in agreement as to the measurements of the building, they did not agree as to the square footage to be rented because of their disagreement as to the applicability of the corridor deduction factor. The issue of the applicability of the corridor deduction factor was never resolved. Finally, Bedford and GSA did not at any time reach an agreement as to the rate to be charged for overtime services, an expense which, in the several years prior to and including 1975, amounted to some $90,000 per year, a substantial sum.

Because Bedford reasonably believed that the terms of the proposed lease would be further negotiated after an award, and because there was no meeting of the minds as to a number of essential items, no contract was made.

## B. *Enforceability*

Even assuming a contract to lease the building was entered into, Bedford argues that the contract was rendered unenforceable because of the Government's misconduct during the negotiations. Specifically, Bedford contends that the contract is unenforceable on grounds of unconscionability, duress and misrepresentation.

Section 2–302(1) of the Uniform Commercial Code provides:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract. . . .

The basic test of unconscionability is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . The principle is one of the prevention of oppression and unfair surprise." *Id.* Official Comment 1. The concept of unconscionability was developed "to prevent the unjust enforcement of onerous contractual terms which one party is able to impose [on] the other because of a significant disparity in bargaining power." *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 68, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827, 830 (1978) (citation omitted). *See also* N.Y.R.P.L. § 235–c (McKinney Supp. 1979–1980) (provision virtually identical to UCC § 2–302 applicable to unconscionable leases). It must be kept in mind, of course, that "[a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d at 67–68, 385 N.E.2d at 569, 412 N.Y.S.2d at 830. *See also George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 218, 385 N.E.2d 1062, 1065, 413 N.Y.S.2d 135, 138 (1978) ("Once a contract is made, only in unusual circumstances will a court relieve the parties of the duty of abiding by it.").

■ The alleged new lease and the manner in which it was negotiated by GSA are in my opinion unconscionable. The terms of the alleged new lease are unreasonably weighted in favor of the Government, and they are so one-sided as to render the alleged new lease unconscionable. The fact that the only other two offers to respond to the Solicitation called for much higher rents and the fact that GSA's SLUC rate was approximately $13.00 per square foot when the composite rental under the alleged new lease using the Government's footage figure was only $9.16 bear this conclusion out. Moreover, the $9.16 figure was based on the full new lease rent; since the alterations called for under the alleged lease had not yet been made, the rent actually received under the alleged lease until the completion of construction would have been much less and the burden on Bedford even greater. The one-sidedness of the alleged new lease was primarily the result of the Government's delays. Bedford submitted its bid in August 1977 and expected an award by late 1977 or early 1978. GSA did in fact decide to recommend Bedford's offer by November 1977. A draft prospectus was sent to Washington in December 1977, but the final prospectus was not sent until June of 1978. No satisfactory explanation was provided by the Government for this delay. Although the Government's time in which to accept Bedford's offer would have expired in April 1978, Bedford granted several of GSA's requests for extensions and extended the time until October 30, 1978. These delays caused a substantial increase in construction costs and a substantial decrease in rental income to Bedford.

The alleged new lease is also unconscionable because of the manner in which the Government conducted its negotiations. GSA did not negotiate in good faith. It misrepresented the extent of Bedford's competition. Even though the other two offers were not competitive, GSA misled Bedford into believing there was strong competition. Even after the Prudential representatives had asked to be notified as

to when they could be released from Prudential's offer, GSA was referring to "other offers" in its negotiations with Bedford. GSA convinced Bedford to offer new ceilings even though new ceilings were not called for in the Solicitation by telling Bedford that the other offerors were offering new ceilings. This disclosure violated the Government's own regulations. *See* DX 248 ch. 3–18, at 24; 41 C.F.R. § 1–3.805–1. GSA also told Bedford the Government would not consider offers net of utilities, even though the other two offers were net and substantially net of utilities. In addition, in the course of negotiations GSA told Bedford its offer had "fat" in it even though GSA knew that Bedford was underestimating its expenses.

■ Knowing that exercising the second renewal option would be financially disastrous to Bedford, GSA continually threatened to exercise the option even though the Government did not intend to do so. Although it may be generally true that threatening to exercise a legal right does not constitute duress, *see, e. g., Business Incentives Co. v. Sony Corp.*, 397 F.Supp. 63, 69 (S.D.N.Y.1975), such action may constitute duress if the threat is made primarily to coerce someone into doing something he otherwise would not do. *See, e. g., Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680, 682 (7th Cir. 1970). In the instant case, first of all, the Government's right to exercise the second option expired on or about May 1, 1978, for the 1973 amendments to the 1962 lease applied only to the notice requirement for the first renewal option. Hence, after May 1, 1978, the Government no longer had a legal right to exercise the second option. In any event, even assuming it did have a legal right to exercise the second renewal, it is clear that it did not intend to do so and that it threatened to do so only to coerce Bedford into coming up with a more favorable offer and into giving the Government more time.

GSA also misled Bedford into believing that the terms of the proposed lease were open to further negotiations after an award was made. GSA's statements to Bedford to the effect that negotiations were "closed" were ambiguous and were contradicted by other GSA statements. It is clear that Bedford would not have acted as it did had it known that the Government was going to subsequently refuse to further negotiate after an award. By failing to give advance written notice of the purported termination of negotiations, GSA violated its own regulations. Moreover, GSA told Bedford it would consider the latter's utilities exchange proposal after an award was made even though it had privately decided to reject the proposal.

GSA's conduct went beyond "hard bargaining in the interest of the Government." *See Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1043, 209 Ct.Cl. 313 (1976). By misrepresenting the extent of competition, by threatening in bad faith to exercise the second option, by misleading Bedford as to the availability of further negotiations, and by engaging in other wrongful acts, the Government placed Bedford in an extremely precarious position financially and deprived Bedford of any real choice of action. Under these circumstances, the Government's conduct constituted duress. The Government's wrongful actions during the negotiations taken in conjunction with the one-sidedness of the terms of the alleged new lease render the alleged new lease unconscionable and therefore unenforceable.

In light of my holdings that no lease was made and that even assuming a lease was made it is unenforceable, Bedford is not liable to the Government for damages. Since there was no valid lease, there could not have been a breach of any lease.

### C. *Bowery's Mortgage*

■ Bowery's first mortgage on 120 Church Street is dated December 16, 1963 and has been modified, extended and consolidated by a series of mortgage agreements, the last one dated August 1, 1975. The mortgage is a valid one, and has been and is in default. It would appear, therefore, that Bowery is entitled to a judgment foreclosing its mortgage. *Ferlazzo v. Riley*, 278 N.Y. 289, 16 N.E.2d 286 (1938); *Broad-*

way *Savings Bank v. Rosenblat*, 32 App. Div.2d 773, 301 N.Y.S.2d 161 (1st Dep't 1969); *Jamaica Savings Bank v. Cohan*, 36 App.Div.2d 743, 320 N.Y.S.2d 471 (2d Dep't 1971).[9] The only defenses asserted by Bedford to Bowery's foreclosure action are laches and lack of subject matter jurisdiction. The laches argument must be rejected, for in a foreclosure proceeding "the doctrine of laches is not available as a defense so long as the statutory period allowed for the commencement of foreclosure has not expired." *Wesselman v. Engel Co.*, 309 N.Y. 27, 32, 127 N.E.2d 736, 739 (1955) (Dye, J., dissenting in part); *accord, Riordan v. Ferguson*, 147 F.2d 983 (2d Cir. 1945). The statute of limitations in New York for the commencement of a foreclosure action is six years. N.Y.C.P.L.R. § 213(4) (McKinney 1972). Bowery filed its suit in March 1979, some three months following Bedford's default. The lack of subject matter jurisdiction claim is also rejected, for the reasons stated in my opinion of March 18, 1980 denying the Government's motion to dismiss.

The Government's original lease expired on October 31, 1978, and the IRS is in possession of the building pursuant to a claimed leasehold interest under the alleged new lease which purportedly commenced on November 1, 1978. Since I have concluded that no valid lease was made, the Government is in possession only as a holdover tenant. Whether the Government is in possession only as a holdover or whether it is assumed a new lease was made, Bowery is entitled to a judgment of foreclosure.

 Under New York law, a lease entered into after the premises has been subjected to a mortgage is subordinate to the mortgage. *220 West 42 Associates v. Ronbet Newmark Co.*, 84 Misc.2d 259, 261–62, 375 N.Y.S.2d 255, 258–59 (Sup.Ct.N.Y. Co.1975), *modified*, 53 App.Div.2d 829, 385 N.Y.S.2d 304 (1st Dep't), *aff'd*, 40 N.Y.2d 1000, 359 N.E.2d 701, 391 N.Y.S.2d 107 (1976). Where a subordinate lessee has

been named as a party in a foreclosure action, a judgment of foreclosure will terminate the lessee's right to a leasehold. *United Security Corp. v. Suchman*, 307 N.Y. 48, 52, 119 N.E.2d 881, 882 (1954); *127 Korea House, Inc. v. House of Korea, Inc.*, 49 App.Div.2d 736, 736–37, 372 N.Y.S.2d 679, 680 (1st Dep't 1975). A holdover tenancy is a new tenancy, not a continuation of the old one, and is created at the moment the prior lease expires, *Kennedy v. City of New York*, 196 N.Y. 19, 23–25, 89 N.E. 360, 361–62 (1909); *Brooklyn Dock & Terminal Co. v. Bahrenburg*, 135 App.Div. 799, 802, 120 N.Y.S. 205, 207 (2d Dep't 1909), *aff'd*, 202 N.Y. 521, 95 N.E. 1123 (1911); hence, the interests of a party in possession solely as a statutory month-to-month tenant are also cut off when a prior mortgage of the premises is foreclosed. *Empire Savings Bank v. Towers Co.*, 54 App.Div.2d 574, 387 N.Y. S.2d 138, 139 (2d Dep't 1976). Since the Government's interest in the building is subordinate to Bowery's mortgage, and since the Government has been named as a defendant, its interest will be cut off by a judgment of foreclosure.

The Government, however, contends that Bowery is not entitled to foreclose the Government's interests in the premises and has raised a number of affirmative defenses: equitable estoppel, unreasonable withholding of approval, unclean hands and waiver.

### (1) Equitable Estoppel

 The elements of equitable estoppel fall into two categories: those that relate to the party sought to be estopped, and those that relate to the party asserting the estoppel. The essential elements relating to the party to be estopped are: (1) conduct which amounts to a false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted, (2) intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of the real facts.

---

**9.** There does not appear to be any dispute that New York law is applicable, for all the parties

have relied on and cited to New York law.

The elements relating to the party asserting the estoppel are: (1) lack of knowledge and the means of acquiring knowledge of the real facts, (2) reliance on the conduct of the party to be estopped, and (3) action based thereon resulting in a prejudicial change of position. *State Bank of Albany v. Fioravanti,* 70 App.Div.2d 1011, 1012–13, 418 N.Y.S.2d 202, 203–04 (3d Dep't 1979), *quoting New York State Guernsey Breeders' Co-operative, Inc. v. Noyes,* 260 App.Div. 240, 248, 22 N.Y.S.2d 132, 140 (3d Dep't), *modified,* 284 N.Y. 197, 30 N.E.2d 471 (1940).

▆▆▆ Since equitable estoppel is an affirmative defense, the Government has the burden of establishing its elements. *Bush v. Remington Rand, Inc.,* 213 F.2d 456, 461 (2d Cir.), *cert. denied,* 348 U.S. 861, 75 S.Ct. 85, 99 L.Ed. 679 (1954). The Government contends that Bowery concealed the facts (1) that the mortgage contained a provision giving the Bowery the right to approve any new lease and (2) that it would not accept a lease based on the terms of Bedford's bid.

The record does not support the Government's contentions. The original mortgage and the modification agreements were all publicly recorded documents. GSA knew at least as early as 1972 of the existence of the Bowery's mortgage, and in 1975 Carl Madonick specifically told GSA of Bowery's right of approval. Hence, GSA had actual knowledge of the existence of the approval provision, and even assuming that it did not have this knowledge, it certainly had the means of ascertaining the provisions of the publicly recorded mortgage. *See World of Food, Inc. v. N. Y. World's Fair 1964–65 Corp.,* 22 App.Div.2d 278, 281, 254 N.Y.S.2d 658, 662 (1st Dep't 1964) (no estoppel where lessee had "means of acquiring knowledge"). In addition, the record is equally clear that Bowery did not conceal the "fact" that it would not accept a lease based on Bedford's bid. This was simply not a fact. Although Bowery personnel had preliminarily concluded on the basis of the information available to the bank that the proposed lease was not acceptable, these conclusions were only preliminary ones based on what the bank personnel believed to be preliminary information. Bowery was under the impression that the proposed terms were going to be further negotiated. The bank did not even see a copy of the proposed lease until January of 1979. As I have found above, no lease was ever agreed to; accordingly, Bowery could not have considered and rejected a "lease" and it therefore could not have concealed something that it did not do. Since Bowery did not conceal any material facts or otherwise create any misleading impressions, it did not intend or expect the Government to rely on such conduct.

Bowery was not a party to the lease negotiations; it therefore had no "duty to speak" and no obligation to inject itself into the negotiations. Indeed, had it done so, it might have left itself open to a suit for tortious interference with contract. The Government's reliance on section 291–f of the Real Property Law, N.Y.R.P.L. § 291–f (McKinney 1968), is misplaced. That section applies to agreements between mortgagors and mortgagees that "cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases of the mortgaged real property *in existence at the time of the agreement.* . . . " (Emphasis added). The agreement between Bedford and Bowery providing for the bank's right of approval did not abridge or otherwise modify the existing 1962 lease; the agreement applied only to any new lease between Bedford and the Government.

The Government has also failed to show that it relied on Bowery's alleged misconduct. The Government introduced no evidence that it acted as it did because of Bowery's alleged misconduct. GSA would not have exercised the second option even if it had known that Bowery was not going to approve the proposed lease. The evidence demonstrates that the Government had no intention of exercising the second option, and that the threats to exercise the option were made only to strengthen the Government's bargaining power. Even assuming that the Government did not know of the

existence of the approval clause in the mortgage and even assuming that the Bowery concealed this existence, the Government presented no evidence that it would have acted differently but for this alleged concealment.

The Government equitable estoppel defense is rejected.

**(2) Unreasonable Withholding of Approval**

 The approval clause of the mortgage, as amended, provided that Bowery's approval was not to be unreasonably withheld. The Government contends that because the terms of the proposed lease were more favorable than the terms of the second renewal option, any withholding of approval would have been unreasonable.

This defense must also be rejected. First, as noted above, the Bank did not withhold approval; it was never asked for approval and did not see a copy of the proposed lease until January 1979, after Bedford had itself rejected it. Second, although the terms of the proposed lease may indeed have been more favorable than the terms of the second renewal option, Bowery would not at all have acted unreasonably in refusing to give approval. The alleged new lease was a losing proposition for Bedford and the proposed rental was well below the fair market rental value of the building. It certainly would not have been unreasonable of Bowery to withhold approval; indeed, it would have been unreasonable for Bowery to have done otherwise.

**(3) Unclean Hands**

 The Government contends that Bowery is not entitled to foreclosure because of the doctrine of unclean hands. The Government points out that foreclosure is an equitable remedy, and argues that Bowery acted in bad faith by concealing the fact that it had decided to reject the proposed lease, waiting for the Government's right to exercise the second renewal option to expire. This defense must be rejected for the same reasons the first two defenses were rejected. Bowery was not presented with a proposed lease to approve; it had only drawn preliminary conclusions on the basis of what it believed to be preliminary information. I can find no bad faith on the part of the bank or its employees. Additionally, under New York law, the doctrine of unclean hands is not a defense to a foreclosure action. *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 122, 250 N.E.2d 214, 219, 302 N.Y.S.2d 799, 806 (1969).

**(4) Waiver**

 A waiver is an intentional or voluntary relinquishment or abandonment of a known right. *Metro-Goldwyn-Mayer, Inc. v. Ross,* 509 F.2d 930, 933 n. 3 (2d Cir. 1975); *City of New York v. State,* 40 N.Y.2d 659, 669, 357 N.E.2d 988, 995, 389 N.Y.S.2d 332, 340 (1976). The record does not support the conclusion that Bowery voluntarily or intentionally relinquished or abandoned its right to approve a new lease or its right to foreclose in the event of a default.

The Government having failed to establish any of its affirmative defenses, Bowery's mortgage will be foreclosed.

**D. *Valuation***

 Section 2409a(b) of Title 28 of the United States Code provides:

> The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

"Just compensation" is to be determined by ascertaining the fair market value of the property at the time of the Government's "taking" of the property, for the owner is entitled to receive the "full monetary equivalent" of the property at the time of taking.

See *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973).

### (1) Date of Valuation

The Government argues that the property in question should be valued as of November 1, 1978, the date the lease expired and holdover status commenced, while Bowery, on the other hand, contends just compensation should be determined by the property's present fair market value.

I agree with Bowery that valuation should be determined as of the present. The cases relied on by the Government, *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *United States v. Drinkwater,* 434 F.Supp. 457 (E.D.Va. 1977); *United States v. Herrero,* 416 F.2d 945 (9th Cir. 1969), *cert. denied,* 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed.2d 267 (1970), are distinguishable from the situation at hand. In *Dow* the United States entered into possession of a piece of property in 1943 pursuant to a condemnation petition and court order. Although the Government did not file a "declaration of taking" until 1946, the Supreme Court held that the "taking" occurred in 1943. The landowners in *Drinkwater* claimed that the Government had engaged in an unconstitutional taking of their property, and the court ruled that just compensation was to be determined by the value of the property at the time the Government took possession. In *Herrero,* although the Government was originally in possession of the property in question pursuant to a lease, when that lease expired the Government effectively seized the property and "[t]he owners were completely and permanently excluded from enjoyment." *United States v. Herrero,* 416 F.2d at 947. The court therefore held that the "taking" occurred when the lease expired. In each of these cases, then, the Government by its actions made it clear that it was in fact "taking" the property through its exercise of its powers of eminent domain.

■■■■ In the instant case, the Government did not manifest any intent to exercise its powers of eminent domain. On the contrary, the Government remained in possession after October 31, 1978 pursuant to what it alleged was a valid and binding leasing contract, and has "disavow[ed] use of its eminent domain power with respect to the 120 Church Street building." *United States v. Bedford Associates,* 618 F.2d 904, at 918 n. 28 (2d Cir. 1980). There is no "taking" of property until the Government has "definitely asserted" its "intent to take." *Gerlach Livestock Co. v. United States,* 76 F.Supp. 87, 97 (Ct.Cl.1948), *aff'd,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); *see also Calvo v. United States,* 303 F.2d 902 (9th Cir. 1962) (although Government remained in possession following termination of lease, its conduct did not amount to a "taking"; "taking" therefore did not occur until subsequent filing of declaration of taking). The Government has not, either by its words or actions, definitely asserted an intent to take. The "taking" therefore will not occur until the Government remains in possession following a judicial determination that it is not legally entitled to possession. Valuation will therefore be determined as of the present time.

### (2) Fair Market Value

■■■■ At trial, each of the parties called an expert witness to testify concerning the value of the premises: Alan J. Greenstein testified for the Government, James Peel for Bowery, and Carl Madonick on behalf of Bedford. On the basis of their reports and testimony and other evidence introduced at trial, my findings with respect to value are: (1) the present fair market rental value is $4,533,350.00 per annum, based on an average square foot rate of $12.77 per square foot for 355,000 square feet of rentable area, with the tenant paying utilities, (2) the present fair market value of the premises is $20,000,000, and (3) the fair market rental value as of November 1, 1978 was $3,280,200 per annum, based on an average square foot rate of $9.24 per square foot for 355,000 square feet of rentable area, with the tenant paying utilities.

The 355,000 square footage figure is based on Greenstein's appraisal. He testi-

fied that he personally measured the floor plans of the building. His figure is consistent with GX 527, which is the tabulation of the net usable space in the building reviewed by GSA and Bedford when they met in January 1978 for the purpose of ascertaining square footage: that exhibit contains the entry 356,822.7 with the notation "RENTAL AREA; NOT DEDUCTING FOR CORRIDORS." At that meeting, GSA and Bedford were in substantial agreement as to the measurements of the building. The present fair market rental rate of $12.77 per square foot is based on Peel's report, and is consistent with GSA's SLUC rate of approximately $13.00 per square foot.

## CONCLUSION

In accordance with the above, I hold that the Government has been in possession of 120 Church Street since November 1, 1978 solely as a holdover tenant with no contractual leasehold interest. The Government's complaint against Bedford is dismissed, and judgment is rendered for Bedford. Bedford is entitled to receive from the Government the difference between the rent it actually received and the fair market rental value of the premises as of November 1, 1978, with the Government responsible for all utilities. In the bank's action, judgment is rendered for Bowery for the relief requested in the first and second claims of the complaint. The Government is directed to pay to the Bowery, as of June 1, 1980, the present fair rental market value of the premises for continued possession. Bedford's counterclaim against Bowery is hereby dismissed. The parties are to make whatever adjustments are necessary to account for the assignment of rents to the Bowery pursuant to the preliminary injunction filed April 17, 1979 and amended on remand.

Submit judgment on notice within 10 days after the date of this opinion.

SO ORDERED.