**In the Matter of ELLISON ASSOCIATES, Debtor.**

**ELLISON ASSOCIATES, Plaintiff,**

v.

**EASTWOOD MANAGEMENT CORPORATION, Bowery Savings Bank, Harris, Beach, Wilcox, Rubin & Levey, Defendants.**

**Bankruptcy No. 80 B 11213.
Adv. No. 80–5408A.**

United States Bankruptcy Court,
S. D. New York.

Aug. 14, 1981.

Louis P. Rosenberg, Brooklyn, N. Y., for debtor; Alfred A. Rosenberg and Richard Koral, Brooklyn, N. Y., of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Eastwood Management Corp.; William J. Rochelle, III and Zachary Kass, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for Bowery Savings Bank; David Kittay, New York City, of counsel.

Costello & Shea, New York City, for Harris, Beach, Wilcox, Rubin & Levey; Ann R. Goodwin, and Frederick N. Gaffney, New York City, of counsel.

*Motions for Summary Judgment, Dismissing this Adversary Proceeding and Chapter 11 Case*

BURTON R. LIFLAND, Bankruptcy Judge.

## I. BACKGROUND

Defendants, Eastwood Management Corporation ("Eastwood"), Ellison Park Enterprises ("Ellison Park"), Harris, Beach, Wilcox, Rubin & Levey ("Harris, Beach") and The Bowery Savings Bank ("Bowery") move for summary judgment dismissing the above-captioned adversary proceeding and Chapter 11 case [1] on the grounds that (1) the debtor filed its petition in bad faith, (2) as to Ellison Park, the debtor is prohibited by § 549(c) from obtaining a turnover of the real property at issue (the debtor's sole claimed valuable asset), (3) the debtor is barred by the doctrines of res judicata and collateral estoppel from relitigating any claim to the property, (4) the debtor is barred by the doctrines of judicial and equitable estoppel from alleging ownership in the property, (5) the debtor is barred by the doctrine of laches from recovering the property, (6) any legal or equitable interests that the debtor may have had in the property were extinguished by the entry of a final judgment of foreclosure and sale, (7) the debtor never acquired title to the property, and (8) the debtor, not having any assets, is unable to effectuate a plan of reorganization. In summary, the debtor, by way of an unrecorded deed, claims ownership to certain real property that was foreclosed upon by senior mortgagee Bowery. Bowery was represented in the foreclosure action by Harris, Beach. The property was purchased by Eastwood at a state court ordered foreclosure sale. Shortly thereafter,

---

1. Title I of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2683, enacted and codified as Title 11 of the United States Code, the "Bankruptcy Code" and all section references cited herein may be found in 11 U.S.C. ——, unless otherwise indicated. Chapter 11, § 1101 *et seq.*, provides for reorganization.

Eastwood sold the property to Ellison Park. On the eve of the foreclosure sale, the debtor filed a Chapter 11 petition. Three months later the debtor commenced this adversary proceeding to chasten the defendants for the alleged violation of the automatic stay provision found in § 362(a) and recover the property.

## II.  SUMMARY JUDGMENT

The matter is ripe for summary judgment. See, Bankruptcy Rule 756. The debtor's Statements of Issues pursuant to S.D.N.Y. Local Civil Rule 3(g), its affidavits and materials otherwise permitted by Fed. R.Civ.Pro. 56 do not "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 56(e). The debtor mainly disputes the legal inferences from the facts, not the facts themselves and has failed to heed the Second Circuit's recent reiteration that:

> ... the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party. *See Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 187–188 (2d Cir. 1978), *cert. denied*, 439 U.S. 868, 99 S.Ct. 181, 58 L.Ed.2d 169 (1979). The litigant opposing summary judgment, therefore, "may not rest upon mere conclusory allegations or denials" as a vehicle for obtaining a trial. *SEC v. Research Automatic Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

*Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

■ The materials presented in opposition to the motion lack the requisite "concrete particulars", *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978), necessary to show that there is a *"genuine* issue as to any *material* fact", Fed.R.Civ. Pro. 56(c) (emphasis added). Rather, they present a bundle of legal theories, unsubstantiated speculations and conclusory allegations. Typical are statements contrary to

damaging prior admissions ferreted out by defendants' discovery. This is patently insufficient.

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Likewise, debtor's call to resolve conflicting inferences that can be drawn from the facts fails to supply the predicate for a trial. *Cf. State Teachers Retirement Bond v. Fluor Corp.*, 500 F.Supp. 278, 294 (S.D.N.Y.1980). In short, "[p]laintiff [debtor] has advanced no 'plausible ground' to warrant a trial." *Maldonado v. Flynn*, 485 F.Supp. 274, 286 (S.D.N.Y.1980).

## III.  FACTS

### A.  *The Debtor and Its Chapter 11 Petition*

1.  The debtor, Ellison Associates, is purportedly a New Jersey limited partnership. (Amended Complaint ¶ 1) (R.3(g) St. ¶ 2).[2]

2.  However, Ellison Associates (a) never filed a certificate of limited partnership or made any partnership filings whatsoever in New Jersey or elsewhere; (b) never maintained a bank account in its own name; (c) never issued purchase orders or paid bills in its own name; (d) never filed a certificate of doing business under an assumed name in New York State; (e) never filed any documents with any governmental authority apart from tax returns; and (f) never prepared any balance sheets, financial statements or statements of income and loss. (R.3(g) St. ¶ 2).

3.  Ellison Associates only claimed asset is an apartment complex in Rochester, New York, known as the Ellison Park Apartments (the "Property"). (R.3(g) St. ¶ 48).

2.  References to the statements filed by Bowery and Eastwood pursuant to S.D.N.Y. local civil Rule 3(g) are abbreviated as "R.3(g) St." followed by the paragraph number. Harris,

Beach's statement is abbreviated "R.9(g) St." (Rule 3(g) was formerly Rule 9(g)). Eastwood's Supplementary 3(g) Statement is indicated "Supp. R.3(g) St.".

4. Ellison Associates has no business other than its alleged ownership of the Property. (R.3(g) St. ¶ 2).

5. Walter Cook ("Cook")[3] is the president of W.J.C. Realty Co., Inc. ("WJC"), the general partner of Ellison Associates. Cook also claims to be a limited partner in Ellison Associates. (R.3(g) St. ¶ 7).

6. Cook was primarily responsible for making the decisions regarding the alleged acquisition of the Property by the debtor and was the person ultimately responsible for the operation of the Property. (R.3(g) St. ¶ 7). It is Cook who controls Ellison Associates and it is he who was deposed on the debtor's behalf.

7. Ellison Associates claims that WJC is the holder of an $8,000,000 note and wrap-around mortgage on the Property given by it to WJC. Although WJC, as holder of the note and wrap-around mortgage, would be by far the largest of the debtor's secured creditors, neither WJC nor the note and wrap-around mortgage is mentioned in any of the schedules filed by the debtor with this court, including those appended to a Supplementary Affidavit in Compliance with Local Rules, sworn to by Cook. (R.3(g) St. ¶¶ 3, 13).

8. Eastern Development & Investment Corporation ("Eastern Development") is a real estate investment company whose president is Cook. (R.3(g) St. ¶ 9).

9. Mid-City Management Corporation ("Mid-City") is a real estate management company whose president is Cook. (R.3(g) St. ¶ 10). In June or July of 1978, Mid-City took over as managing agent of the Property. (R.3(g) St. ¶ 54).

10. On July 31, 1980 at 5:15 p. m. Ellison Associates filed in this court a petition for reorganization under Chapter 11 of the Bankruptcy Code, § 1101 et seq.

11. Ellison Associates did not serve the summons and complaint initiating the above-captioned adversary proceeding until more than three months after filing its Chapter 11 petition. (R.3(g) St. ¶ 72).

### B. The Debtor's Claim of an Interest in the Property

12. In June of 1978 Eastern Development purportedly entered into a contract (the "Purchase Contract") to buy the Property from its then-owners, Arthur N. Bailey ("Bailey") and Warren T. Erickson ("Erickson"). (R.3(g) St. ¶ 18).

13. Thereafter, Eastern Development purportedly assigned the Purchase Contract to WJC. (R.3(g) St. ¶ 18).

14. Ellison Associates claims that WJC obtained title to the Property at a closing in or about June or July of 1978 and subsequently conveyed the Property to Ellison Associates. (R.3(g) St. ¶¶ 18, 49).

15. Ellison Associates claims an interest in the Property pursuant to a deed from WJC, which was a bargain and sale deed without warranties. (R.3(g) St. ¶ 17). This deed to Ellison Associates was dated June 20, 1978 and was never redated. (R.3(g) St. ¶ 17, Ex. H).

16. There was never a contract of sale between WJC and Ellison Associates (R.3(g) St. ¶ 28).

17. At the closing in June or July of 1978, Ellison Associates claims that WJC gave an $850,000 purchase money third mortgage on the Property to Bailey and Erickson (R.3(g) St. ¶ 51) and that Ellison Associates gave an $8,000,000 wraparound mortgage to WJC. (R.3(g) St. ¶¶ 3, 13).

---

**3.** Cook is no stranger to bankruptcy court proceedings in this district. Two other Cook dominated real estate ventures are or were pending before me: *In the Matter of Eden Associates,* 13 B.R. 575 and *In the Matter of Chanticleer Associates,* No. 77 B 1463; another is pending before my colleague, Hon. John J. Galgay: *In the Matter of Caravan Associates,* No. 80 B 11696; and another was transferred on a venue change motion by my colleague, Hon. Joel Lewittes: *In the Matter of Olde Concord Associates,* 4 B.C.D. 177 (S.D.N.Y.1978). See also: *Mid-City Management Corp. v. Loewi Realty Corp.,* 643 F.2d 386, Bankr.L.Rep. (CCH) ¶ 68,044 (5th Cir. 1981), *In re Country Club Manor Adventure,* No. 78 B 759 (S.D.N.Y.) *In re El Morocco Associates,* No. 77 B 2096 (S.D.N.Y.). *Meyerson v. Werner,* 78 Civ. 5796 (S.D.N.Y.). (See Sup.R. 3(g) St. ¶ 69, 109–110, 125–169).

18. None of the aforesaid deeds (R.3(g) St. ¶ 29) and mortgages (R.3(g) St. ¶ 26) were recorded prior to the time Ellison filed its Chapter 11 petition.

### C. *The Escrow Agreement Between Bailey and WJC*

19. At the purported closing in June or July of 1978, the deed from Bailey and Erickson to WJC was not delivered to WJC. Rather, the deed was given to Robert Sylvor, Esq. ("Sylvor") as escrow agent, to hold in escrow pending the happening of certain conditions. (R.3(g) St. ¶ 19). Bailey, as seller, had insisted that the deed to WJC be held in escrow, and Cook testified that it was "part of the deal" that the deed to WJC be held in escrow. (R.3(g) St. ¶ 21).

20. Similarly, the purchase money mortgage purportedly given by WJC to Bailey and Erickson was also given to Sylvor to hold in escrow. (R.3(g) St. ¶ 26).

21. The parties signed a document entitled "Escrow Agreement." (R.3(g) St. ¶ 22).

22. The Escrow Agreement provided, *inter alia*, that the deed to WJC remain in escrow until the escrow agent had received written notice from Bailey and Erickson that a certain tax certiorari proceeding had been settled or until one year had passed. The deed was then to be released from escrow and delivered to Pioneer National Title Insurance Company ("Pioneer"). The escrow agent never received any written notice from Bailey or Erickson concerning the tax certiorari proceeding. (R.3(g) St. ¶ 22).

23. Cook testified that there were never any written or oral amendments to the Escrow Agreement and that Sylvor did not violate the terms of the Escrow Agreement. (R.3(g) St. ¶ 23). A 30-day extension of the escrow was purportedly requested by Bailey and consented to by Cook. (Plaintiff's R.3(g) St. ¶ 9).

24. The Escrow Agreement required that Pioneer obtain delivery of the deed and bond and mortgage to record them. WJC would have been responsible for paying the recording fees. None of these documents was ever delivered to Pioneer, and they were never recorded by Pioneer, WJC, the debtor, or anyone associated with those entities. (R.3(g) St. ¶ 25).

25. The Escrow Agreement also provided that a bond and mortgage dated June 20, 1978 from WJC, as mortgagor, to Bailey and Erickson, as mortgagee, together with a letter agreement among Bailey, Erickson and WJC would be held in escrow by Sylvor. Both the bond and mortgage and the letter agreement were delivered at the closing to Sylvor as escrow agent. Cook testified that Sylvor still holds the bond and mortgage and that Sylvor still retains possession of the letter agreement, which has not been released from escrow and delivered to Bailey and Erickson. (R.3(g) St. ¶ 26).

26. With respect to this transaction, Sylvor did not work for Cook, did not serve in any capacity aside from escrow agent, and was selected as escrow agent by mutual agreement between Bailey and Cook. Sylvor did not represent Cook, WJC or the debtor as an attorney with respect to this transaction. (R.3(g) St. ¶ 20).

27. Prior to filing its Chapter 11 petition, Sylvor never delivered the deed to WJC, nor did Sylvor deliver the purported purchase money third mortgage or the letter agreement to Bailey and Erickson. (R.3(g) St. ¶¶ 26, 27). WJC never demanded delivery of the deed from Sylvor (R.3(g) St. ¶ 24), and Cook testified that shortly after the expiration of the one-year period, Cook and his associates "forgot" about the deed's existence. (R.3(g) St. ¶ 24).

### D. *The Underlying Contract Defaults*

28. Ellison Associates claims that the cash purchase price of $250,000 called for in the Purchase Contract was paid in part by delivering a $125,000 note to Bailey and Erickson (the "Note"). The Note was dated July 27, 1978 and was due on September 8, 1978. (Supp. R.3(g) St. ¶ 76).

29. Ellison Associates claims that it paid only $45,000 owing on the Note. (Supp. R.3(g) St. ¶ 77).

30. Ellison Associates therefore admits that it never paid the remaining $80,000 due on the Note. (Supp. R.3(g) St. ¶ 78).

31. Even if Ellison Associates alleges that the Note was extended until January 15, 1979, the Note was in default on January 15, 1979, eight months prior to the expiration of the purported escrow period in August, 1979. (Supp. R.3(g) St. ¶ 79) (one year plus 30 day extension, see facts 22, 23).

32. WJC never made a single payment of principal or interest pursuant to the purported $850,000 purchase money mortgage to Bailey and Erickson. (R.3(g) St. ¶ 52).

33. Cook admitted that the purchase money mortgage is in default. (R.3(g) St. ¶ 53).

E. *The Debtor's Involvement in Bailey's Representations that Bailey Owned the Property*

34. Subsequent to the purported closing in June or July of 1978, the purported grantors, Bailey and Erickson, continued to act and to hold themselves out as the owners of the Property with the knowledge and acquiescence of Cook and Ellison Associates. (R.3(g) St. ¶¶ 31, 36, 37, 38, 55, 56, 57).

35. Cook admitted that he and Bailey have been in frequent communication concerning the Property since the spring of 1978. (R.3(g) St. ¶ 11).

36. For example, during the summer of 1979 there were defaults on the Bowery mortgage, and Bailey, with Cook's knowledge and permission, negotiated with Bowery and signed a modification agreement of the Bowery mortgage dated July 1, 1979. (R.3(g) St. ¶ 36).

37. Cook, an expert in real estate mortgage lending, knew that a mortgagor must warrant title to the property being mortgaged. (R.3(g) St. ¶ 34). In the modification agreement Bailey warranted to Bowery that he had title to the Property. (R.3(g) St. ¶ 37).

38. In October of 1979 Bailey executed and delivered to Commercial Credit Development Corporation ("Commercial Credit") a $700,000 mortgage on the Property in which he expressly warranted that he had title to the Property. (R.3(g) St. ¶ 31).

39. Prior to the closing of this mortgage, Cook (1) knew that Bailey intended to mortgage, (2) gave Bailey permission to make the mortgage, (3) was informed of the terms of the mortgage, (4) was informed of the closing date with Commercial Credit, (5) was told by Bailey that WJC or Ellison Associates would not be required to sign any documents in connection with Bailey's giving the mortgage, and (6) knew that Bailey would be the named mortgagor. With respect to Bailey's mortgaging the property to Commercial Credit, "[Cook] knew what [Bailey] was doing; [Cook] gave [his] permission to it." (R.3(g) St. ¶ 31).

40. Ellison Associates admitted that it had a representative, Norman Kaye ("Kaye"), an officer of WJC, at the closing and that Kaye had actual knowledge of the terms of the Commercial Credit Mortgage. (Supp. R.3(g) St. ¶¶ 85, 86).

41. In addition, Bailey executed and delivered to First National Bank of Jamestown, Division of Lincoln First Bank, N.A., a mortgage on the Property in the principal amount of $200,000, which was recorded on October 9, 1979. (R.3(g) St. ¶ 56).

42. Bailey also executed a deed dated February 2, 1980, which conveyed his title in the Property to an entity known as Grummbusco, Inc. The deed was recorded on February 4, 1980. (R.3(g) St. ¶ 57). (Grummbusco was named in the Foreclosure Action.)

F. *The Foreclosure Action*

43. On December 6, 1979, Bowery, as the holder of the pre-existing first mortgage on the Property, through its attorneys, Harris, Beach, filed a notice of pendency and commenced an action (the "Foreclosure Action") in the Supreme Court of the State of New York, County of Monroe (the "Foreclosure Court"), to foreclose the lien of its mortgage. (R.9(g) St. ¶ 3). Bowery named Bailey and all other persons claiming an apparent interest in the Property as defendants. (R.3(g) St. ¶ 39).

44. At that time, Ellison Associates had no interest of record in the Property. (R.9(g) St. ¶ 2).

45. Thereafter, Letha Miller ("Miller"), an employee of Mid-City who was the manager of the Property, was served with a summons and complaint in the Foreclosure Action and named as a party defendant. (R.3(g) St. ¶ 40). Miller immediately informed Cook of the commencement of the Foreclosure Action in December of 1979. (R.3(g) St. ¶ 41).

46. The Foreclosure Court rendered a judgment of foreclosure and sale (the "Foreclosure Judgment") which was entered on June 24, 1980. (R.9(g) St. ¶ 4; R.3(g) St. ¶ 42 and Exh. E).

47. The Foreclosure Judgment ordered that a sale of the Property take place on August 1, 1980 (R.9(g) St. ¶ 5). A court-appointed referee conducted the sale of the Property on August 1, 1980, expressly pursuant to court order. (R.9(g) ¶ 10). (R.3(g) St. ¶ 62).

48. At no time prior to the entry of the Foreclosure Judgment did either WJC or Ellison Associates seek to intervene in the Foreclosure Action. (R.3(g) St. ¶ 41).

49. The Foreclosure Judgment was final and never appealed. (R.3(g) St. ¶ 42).

### G. Actions by Ellison Associates and Its Controlling Persons Inconsistent with Its Claimed Interest in the Property

50. On January 22, 1980, WJC filed a mechanic's lien against the Property. The notice of lien, verified by Kaye, stated that the "fee interest" in the Property was owned by "Ellison Park Apartments." (R.3(g) St. ¶ 4).

51. On July 31, 1980, the same day that Ellison Associates filed its Chapter 11 Petition, Ellison Associates caused Kaye to file an affidavit in the Foreclosure Court in which Kaye swore that an entity named "W.J.C. Realty Co.", a limited partnership, owned the Property. (R.3(g) St. ¶¶ 43, 44).

52. Ellison Associates alleges that on July 31, 1980, it sent mailgrams to Bowery and Harris, Beach stating that the owner of the Property was "Ellison Park Associates." (R.3(g) St. ¶ 15).

53. In fact, an entity known as "Ellison Park Associates"—which was totally unrelated to the debtor in this case—did appear in the chain of title to the Property. (Transcript of May 14, 1981 at 88–90). A description of transfers to and from "Ellison Park Associates" appeared in Bowery's complaint in the Foreclosure Action. (R.3(g) St. Exh. J at pages 5–10). Significantly, the foreclosure complaint and the title report disclosed that "Ellison Park Associates" had no interest in the Property as of the day of the foreclosure sale because "Ellison Park Associates" had transferred the Property to Bailey and Erickson in 1977.

54. During the time the debtor now claims it owned the Property, the debtor and Cook acquiesced and participated in Bailey's holding himself out as owner of the Property. Representations to the effect that Bailey was the owner were made to Bowery, among others. (R.3(g) St. ¶¶ 31–38).

### H. The Foreclosure Sale and Eastwood's Subsequent Investment in the Property

55. Eastwood, in an arm's length transaction involving competitive bidding, purchased the Property at the judicial sale for $3,351,000 in cash. (R.3(g) St. ¶ 62 and Exh. F).

56. At no time prior to the foreclosure sale did Ellison Associates communicate with Eastwood or Ellison Park. (R.3(g) St. ¶ 65).

57. No representative of the debtor, Ellison Associates, attended the foreclosure sale (R.3(g) St. ¶ 64).

58. Thereafter, Eastwood conveyed the Property to Ellison Park, and the deed to Ellison Park was recorded in the County Clerk's office on September 5, 1980. (R.3(g) St. ¶ 67).

59. During the more than three months between the Commencement of Ellison Associates' Chapter 11 case and the service on Eastwood of a summons and complaint in the instant adversary proceeding, Eastwood

and Ellison Park entered into contracts for $797,350 worth of improvements and repairs to the Property. (R.3(g) St. ¶ 73).

60. During that time Eastwood and Ellison Park actually expended $162,900 for improvements and repairs. (R.3(g) St. ¶ 73).

61. As of April 20, 1981, Eastwood and Ellison Park had contracted for $797,350 and expended $505,383 for improvements and repairs. (R.3(g) St. ¶ 74).

62. At no time during the more than three months prior to the commencement of the adversary proceeding did Ellison associates communicate with Eastwood. (Transcript of May 14, 1981 hearing before this court at 76–79; Cook Deposition Transcript at 235).

## IV. DISCUSSION

Debtor's complaint-in-chief is that defendants caused and/or participated in the foreclosure sale in violation of the automatic stay of § 362(a). A review of the relevant portions of that subsection, § 362(a)(2), (3) and (4), makes it clear that any infraction hinges upon finding that the property foreclosed upon was "property of the estate" as that term is defined in § 541. Resolution of the debtor's property interest is totally dispositive. If the debtor had no interest, legal or equitable, in the Property (§ 541(a)(1)), the relief prayed for by defendants must be granted. Bearing this in mind, the court's attention turned first to the verity of the ground (Number 7) that challenges debtor's claimed title to the Property. On the basis of extensive review of authority, the court adjudges that the debtor had no interest in the property whatsoever, that the property not being property of the estate, defendants could not have transgressed § 362(a), and that consequently, the debtor's Chapter 11 must be dismissed pursuant to § 1112(b). The court further concludes that even had the debtor acquired title to the property it would nonetheless be equitably estopped from asserting title to it. (ground number 4)

In view of our focus on grounds 7 (debtor's interest in the property) and 4 (equitable estoppel), the court will decline to comment upon defendants' multifarious other moving grounds. It should be noted, however, that many of the other proffered grounds have substantial merit and are supported by the established facts. The facts set out are limited to those necessary to this opinion.

### 1. The Debtor Did Not Receive Title to the Property.

This holding is anchored on four grounds. First, in the court's opinion, the escrow was abandoned, and therefore, no title passed to debtor's alleged predecessor-in-interest WJC. Second, if not abandoned, all conditions precedent to the delivery of the deed out of escrow had not been satisfied and thus WJC, the grantee under the escrow, was not entitled to the deed and no other delivery took place. Third, notwithstanding compliance with conditions precedent, the deed was never delivered to WJC because even if actual, physical delivery of the deed is not necessary (a delivery that did not occur here) "deemed delivery" would not be appropriate in this case. Lastly, assuming delivery of the deed out of escrow to WJC, no interest passed to the debtor.

### A. The Escrow Was Abandoned

An escrow requires a valid contract between the parties that encompasses both the subject matter and the delivery of the instrument. 20 N.Y.Jur. *Escrow* § 4 at 208. This arrangement, like any contractual arrangement, may be mutually abandoned by the parties to it, and the escrow thereby rendered ineffectual for any purpose. Further, abandonment need not be marked with formality equal to that used in establishing the escrow. Conduct inconsistent with the escrow is sufficient for the court to conclude it abandoned. As was stated by one court: "While no express agreement to abandon and rescind the original contract is shown, the facts are sufficient to sustain the court's finding that it [the escrow] had been abandoned." *Miller v. Dealh*, 239 S.W. 679, 685 (Tex.Civ.App. 1922); *See also, Green v. Huckstep*, 447 S.W.2d 297, 299 (Mo.1969).

WJC, the grantee under the escrow, (facts 19, 21) never paid $80,000 of the $250,000 purchase price. (facts 28–30) The accompanying note is in default. (fact 31) WJC further never made a single payment of principal or interest on its $850,000 purchase money mortgage, and it is likewise in default. (facts 17, 32, 33) Moreover, this mortgage was never recorded or even delivered by the escrow agent to the grantor. (facts 20, 24) Nor did WJC ever demand delivery of the deed to the Property. (fact 27) What did occur were repeated incidences, both before and after the period in which the escrow would have expired, where Walter Cook, President of WJC (the general partner of the debtor), maestro and controlling force behind all the transactions involved herein, and other officers of WJC, acquiesced in the grantors' holding of themselves out as the unbridled owners of the Property. (facts 34–41) Finally, the grantor conveyed the Property to a third party who promptly recorded.[4] (fact 42)

■ Given the facts of the myriad material defaults and breaches by WJC, the reciprocal indifference of the parties to recover the bounty of their original undertaking, and the parties subsequent conduct, the court concludes, without hesitation, that the escrow was abandoned. Title therefore never passed to WJC, and, accordingly, no interest passed to the debtor. *See* N.Y. R.P.L. § 245 (quoted *infra*).

B. *Material Conditions Precedent to Delivery of the Deed Out of Escrow Had Not Been Satisfied*

■ A deed placed in escrow imposes an additional requirement to the passage of title: the conditions of the escrow must be satisfied. Performance of the condition or the occurrence of the contingency of the escrow are prerequisite to the delivery of the deed out of escrow. *Stanton v. Miller*, 58 N.Y. 192, 201 (1874); *See Alexander v. Quality Leather Goods Corp.*, 150 Misc. 577, 579–580, 269 N.Y.S. 499, 502 (1934).

**4.** Note N.Y. R.P.L. § 291, a race-notice recording statute, voids unrecorded deeds as against bona fide purchasers.

In addition to the termination of a certain tax proceeding or the alternative one year (plus 30 days) time expiration, the "escrow agreement" (fact 21) required the transmittal of the deed to a specific title insurance company (not to the grantee), (facts 22, 24) as well as the release and turnover of a certain letter agreement. (fact 25) Neither of these terms to the escrow were completed. (facts 24, 25, 27) These integral components of the parties' bargain cannot be discarded or ignored.

■ In *Powerdly v. Aetna Casualty & Surety Company*, 72 Misc.2d 251, 338 N.Y. S.2d 555 (Sup.Ct. Monroe Co. 1972) the court held that an agreement, which required the recording of the papers and the redating of the abstract to show whether title was clear, established conditions precedent that must be satisfied before title could pass by way of the deed, despite the fact that the papers had been delivered to the grantees. Thus, under the facts in the instant case the non-fulfillment of the recording and turnover terms necessary to consummate the escrow (conditions precedent like those in *Powerdly*) prevented any delivery out of escrow. *See Stanton supra; Alexander, supra.* Title, therefore, never passed to WJC, and, accordingly, no interest passed to the debtor. *See,* N.Y. R.P.L. § 245 (quoted *infra*)

C. *Deemed Delivery As Urged by the Debtor Would Not Be Appropriate in this Case*

Assuming that the sole issue was one of delivery, the debtor still falls short. Neither side contests that a deed must be "delivered" to effect a transfer of title. New York R.P.L. § 244 so provides.

A grant takes effect, so as to vest the estate or interest intended to be conveyed, only from its delivery; and all the rules of law, now in force, in respect to the delivery of deeds, apply to grants hereafter executed.

(McKinney 1968). The highest court of New York has further stated: "Transfer of title is accomplished only by the delivery of an executed deed; execution of the deed without delivery is legally insufficient to effect such a transfer." *Manhattan Life Insurance Co. v. Continental Insurance Companies*, 33 N.Y.2d 370, 372, 353 N.Y. S.2d 161, 162, 308 N.E.2d 682, 683 (1974).

Where debate can be found is on the issue of whether actual, physical delivery of the deed to the grantee is necessary, as defendants contend, or whether upon satisfaction of the terms of the escrow agreement the deed must be deemed to have been delivered, as the debtor asserts. There was no actual, physical delivery of the deed. (facts 24, 27)

Defendants emphasize that New York case law is explicit and backed by a long, unbroken chain of authority. Specifically, they point to *Stanton v. Miller*, 58 N.Y. 193 (1874) where over a century ago in an escrow case New York's highest court squarely addressed the issue and pronounced: "[n]o title passes ... until an actual delivery of the deed to the grantee after the happening of the event upon which title is suspended." *Id.* at 201. *See also* 2 Warren's Weed, *Real Property*, Escrow § 2.01 and 6 Brooklyn L.Rev. 79 (a 1936 Note wherein the author acknowledges (disapprovingly) that "New York goes so far as to withhold title from the grantee until the moment of actual manual delivery of the deed by the escrow agent." *Id.* at 81). More recently, defendants point out, New York's Court of Appeals, in a lease case, supplied an abundance of language that could be read to reaffirm this principle. See, *219 Broadway Corporation v. Alexander's, Inc.*, 46 N.Y.2d 506, 511–512, 414 N.Y. S.2d 889, 892, 387 N.E.2d 1205, 1208 (1979).

On the other hand, relying upon *Mechanics Nat'l Bank v. Roughead*, 76 A.D. 534, 78 N.Y.S. 800, 808 (4th Dep't 1902) *Aff'd* 175 N.Y. 518, 67 N.E. 1085 (1903); *Rapp v. Cansdale*, 29 Misc.2d 236, 245, 214 N.Y.S.2d 522, (1960) *Aff'd* 12 A.D.2d 884, 211 N.Y. S.2d 1002 (4th Dept. 1961); and, 20 N.Y.Jur. *Escrow* § 19, the debtor asserts that where the conditions of the escrow are satisfied, the deed must be deemed delivered, the escrowee having no right to retain or destroy it. None of the cases cited by the debtor, nor for that matter by New York Jurisprudence, are on point providing direct support or authority for "deemed delivery" as an accepted part of the law of this state.

Viewing defendants' cited precedent as narrowly as possible and taking heart with rebellious secondary authority for the moment, and focusing on the underlying considerations, the court nonetheless finds itself unable to travel the road suggested by the debtor. To support its argument, the debtor explains that "deemed delivery" is a necessary protection against wrongful conduct on the part of an escrowee. But this consideration is sorely lacking here. There was no claim that the escrow agent's conduct was wrongful or that the deed was improperly withheld. To the contrary, Walter Cook testified that the escrow agent, an independent party to the transaction, did not violate the terms of the Escrow Agreement. (facts 23, 26) The reality is simply that WJC never demanded delivery of the deed from the escrow agent. If anyone is at fault for nondelivery, it is Walter Cook and his other associates and officers of WJC, who according to Cook, "forgot" about the deed. (fact 27)

In short, this is an inappropriate case for the application of what, at the very least, would amount to an expansion of present common law. Furthermore, the second part of N.Y. R.P.L. § 244, quoted above, (eff. Feb. 17, 1909) may very well have statutorily locked in the common law requirement of actual, physical delivery in New York.

■ No delivery having taken place, title remained in the grantor. *Stanton supra* ; Warren's Weed, *supra*. Title therefore never passed to WJC, and accordingly, no interest passed to the debtor. *See* N.Y. R.P.L. § 245 (quoted *infra* ).

E. *The Deed to the Debtor Could Not Have Passed Title*

■ At the time WJC allegedly delivered a deed conveying the Property to the debt-

or, the one-year plus 30-day period of time claimed to have satisfied the escrow conditions had not run. (facts 14, 15) The escrow conditions not having been satisfied at that point, WJC was certainly not entitled to delivery. *Stanton supra.* There being no delivery, the grant to WJC could not take effect. R.P.L. § 244 (quoted above). Thus, WJC had no title to convey to the debtor.

N.Y. R.P.L. § 245 provides: "A greater estate or interest does not pass by any grant or conveyance, than the grantor possessed or could lawfully convey, *at the time of the delivery of the deed . . . .*" (emphasis added). Accordingly, by force of statute, the debtor received no interest in the Property from WJC. The attempted transfer was therefore a nullity.

Unfortunately, the analysis cannot end here. Equitable doctrines of relation, estoppel by deed and equitable title must be reviewed at this point.

■ In a broad sense, an escrow contemplates two deliveries. The first is that of the grantor to the escrow agent and the second is that from the escrow agent to the grantee. As discussed earlier, the general rule is that title passes from the time of the second delivery. However, this rule is subject to exception. Where to prevent injustice, manifest hardship or wrong, it is necessary to give a deed deposited in escrow effect from the *first* delivery, as in cases where events intervening the first and second deliveries would disrupt the operation of the deed, the fiction of relation will be applied to achieve this result. For example (and this is its most common application), where a grantor dies before the escrow conditions are performed and the grantee thereafter satisfies the escrow, the deed will be upheld. *See e. g. Ruggles v. Lawson,* 13 Johns. 285 (N.Y.1816). In New York relation is applied conservatively. *See Jackson v. Rowland,* 6 Wend. 666, 671 (N.Y. 1831).

*American Jurisprudence,* citing to *Beekman v. Frost,* 18 Johns. 544 (N.Y.1821), states the following proposition.

Where the grantee in an escrow deed, after the deposit of the instrument in escrow but before the performance of the condition upon which it was to be delivered, makes a conveyance of the land to a third person, the escrow deed relates back to its original deposit, upon the performance of the condition, so as to validate the conveyance made by the grantee.

28 *Am.Jur.2d,* Escrow § 35 at 48. The statement is too broad a generalization of the law.

■ The essentials of the fiction, as applied to escrow, are derived from *Butler and Baker's Case,* 76 Eng.Rep. 684 (K.B. 1591). *See Frost v. Beekman,* 1 Johns. Ch. 288, 296 (N.Y.1814); *Jackson v. Rowland, supra. Butler* applies to situations in which a grantor's ability to convey is impeded by some obstacle which prevents him from transfering title. Under such circumstances, an outright grant would be void. *Butler* at 707 Note U1. However, where this same grant is made by way of escrow, it will be good if (1) the grantor had the power or ability at law to make the first delivery (i.e.: is not an infant) and (2) the impediment is removed before the second delivery. *Id.* at 707–708. In upholding the validity of the deed through the conduit of escrow, the court, in effect, views the two deliveries as one continuing transaction. *Id.* at 708.

■ *Butler,* itself, has no application to the instant case. Grantors Erickson and Bailey had at all times full ability to convey title to WJC. (see facts 12, 19) And, while WJC's ability to pass title was indisputably impeded, its grant was outright and is therefore ineffective. Moreover, the two conveyances—Erickson and Bailey to WJC and WJC to Ellison—do not have the requisite, inherent, integral relation to one another such that "the second [delivery] is but an execution and consummation of the first [delivery] . . . *et ut res magis valeat quam pereat* [and that the thing may rather have effect than be destroyed] it shall have relation by fiction to be his deed *ab initio,* [from the beginning] by force of the first delivery . . . ." *Id.* at 708.

Further, if this was not sufficient, Lord Coke teaches:

[R]elations shall extend only to the same thing, and to one and the same intent, so they shall extend only between the same parties, and *shall never be strained to the prejudice of a third person who is not a party, or privy to the said act.*

*Id.* at 693 (emphasis added); *accord Case v. De Goes* 3 Caines R. 261, 262 (N.Y.1805);

None of the defendants are parties or privies to either of the two relevant grants.

In short, the facts of the case must fall within the scope of the proper application of the fiction. Here they do not. See *Jackson v. Rowland, supra* (where following a discussion of the applicability of *Butler* the court remarked: "The necessity which justifies a resort to fiction does not exist in this case.")

With this background, the court may now turn to the authority relied upon by *Am. Jur.* First, reference must be made to the lower court opinion reported at 1 Johns. Ch. 288 (N.Y.1814). The citation supplied is that of appellate review, where the court, so far as relevant to relation, did no more than "entirely concur in the opinion expressed by the chancellor, that the deed was well delivered; that the condition was performed according to the views, expectations and instruction of the parties; *and that it related back so as to validate the conveyance to [the grantees].*" *Beekman v. Frost,* 18 Johns. 544, 564 (N.Y.1820) (Emphasis added). No further discussion on relation is provided by the appellate court.

Exactly where the reviewing court draws its concurrence from is a bit enigmatic. The lower court, which recognized *Butler* as the dominant precedent, 1 Johns. Ch. at 296, ultimately held that the doctrine of relation should *not* be applied. *Id.* at 297–298. There is interposed, however, this statement.

If the question was between [the grantee under the escrow] and the persons to whom he sold, the deed ought to

relate back, so as to give effect to his intermediate grants, and prevent him from defeating them. This is the amount of the doctrine in *Jackson v. Bull,* (1 Johns.Cas. 81) [1799]

*Id.* at 297. Hence, support of a conveyance by a grantee under an escrow, after the deposit but before satisfaction of the conditions and concomitant final delivery, should be found in this last cited case. I submit it is not.

*Jackson v. Bull* upheld a grant intermediate of a *consummated, valid, outright sale and purchase of certain real property and* receipt of a deed to that property. There had been *full payment* of the purchase money. Further, the sale was conducted pursuant to a state foreclosure statute, and the deed was viewed merely as technical consummation or evidence of the grant, which had vested by the very force of the statute itself.

Though the law is elastic, the chancellor's analogy stretches too far. As stated at 4 Tiffany, *Law of Real Property* § 1053 (1975 ed.)

Decisions to the effect that, upon the satisfaction of the condition, the grantee's title, that is, how ownership, relates back to the time of the delivery, for the purpose of validating an intermediate quitclaim conveyance by the grantee, appear to be questionable....

*Id.* at 441 (noted cases include *Beekman v. Frost, supra* ). Among other things, the good chancellor's *gratis dictum* ignores the precepts of *Butler and Bakers case, supra.* While, this court, a court of equity,[5] does not pay homage to the niceties of real property conveyancing, certain rules must be abided by.

More importantly, the underlying concern evinced by the chancellor—the protection of innocent grantees—is not present.

The debtor in the instant case was acutely aware of the limbo status of the deed by

---

5.  See *Bank of Marin v. England,* 385 U.S. 99, 102, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *Securities and Exchange Commission v. U. S. Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1950); *Pep-* *per v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *Continental Bank v. Rock Island Ry. Co.,* 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935).

which WJC laid claim to its alleged ownership. (facts 5, 6, 13, 14) Moreover, unlike the purchaser in *Jackson v. Bull*, WJC was guilty of multiple defaults and breaches with respect to a prodigious portion of the purchase consideration. (facts 28, 29, 30, 32, 33) Any parallel existing between the instant case and the aforecited case is thereby rendered obtuse.[6] Nor was there any statutory vesting here. In fact, N.Y. R.P.L. § 245, *supra*, may have supplanted these early cases.

On the basis of the foregoing, I conclude, "[t]he transaction must be left to rest upon its simple and naked truth." *Frost v. Beekman*, 1 Johns. Ch. 288, 297. No title passed by way of the deed from WJC to the debtor.

Assuming *arguendo* that at some point title did lodge in WJC, could the debtor assert an interest through "estoppel by deed"? I conclude not.

■ A grantor who executes a deed conveying property to which he has no title or defective title will generally be estopped to take a position inconsistent with his grant should he later receive "after-acquired" title. *See generally* 4 Tiffany *Real Property* § 1230 at 1101; *see also Tubb v. Rolling Ridge, Inc.*, 28 Misc.2d 532, 214 N.Y.S.2d 607, 611 (1961).

■ But here, we have no battle between grantor and grantee; it is defendants who contest title. Moreover, the debtor is not an innocent purchaser. The status of WJC's title was no secret to the debtor. Consequently, the precarious status of its own deed was known to the debtor from the outset. Because of this culpability, application of the doctrine is unwarranted. See also 31 C.J.S. *Estoppel* § 12 at 297–298 (estoppel on estoppel).

And, exactly what interest would WJC be estopped to deny? The answer is none. There was no contract of sale between WJC and the debtor and the deed was a mere bargain and sale deed without warranties. (facts 15, 16) No express representation as to ownership or title was made, a necessary element of estoppel by deed. *In re Testan*, 156 Misc. 449, 450, 281 N.Y.S. 96, 97 (1935). *See also House v. McCormick*, 57 N.Y. 310, 321 (1874); *Caldwell v. New York & H. R. Co.*, 111 A.D. 164, 169, 97 N.Y.S. 588, 591 (1906).

The court also notes the absence of any financial loss. WJC never recorded the mortgage, and the debtor never scheduled it as a debt. (facts 7, 17, 18) According to the debtor, WJC expressed a willingness to release the purported mortgage (Plaintiff's Rule 3(g) stat., No. 2).

The court's *coup de grace* must be delivered to the debtor's claim of "equitable title". By a last faint, faltering breath, in a desperate effort to salvage some factual issue to defeat summary judgment, the debtor advances that WJC took title to the property as a "fiduciary" for it. The chief substantiation proffered is an *ipse dixit*, self serving statement made by Cook in one of his various (often contradictory) affidavits. This statement is in contrast to a host of actions that clearly negate any trust arrangement with respect to the purchase and transfer of the Property. WJC's conduct on the record was entirely inconsistent with any other conclusion. "Courts, refusing to exalt form over substance, cannot be awed by procedural spectres, and cannot be swayed by feigned issues." *Feick v. Fleener*, 653 F.2d 69, at 77 (Part IV) (2d Cir. 1981) (upholding summary judgment).

---

**6.** And what of *Frost v. Beekman* itself? Its true and sole vitality is best expressed by the recent case of *Baccari v. DeSanti*, 70 A.D.2d 198, 431 N.Y.S.2d 829 (2d Dept. 1979).

At least since the case of *Frost v. Beekman* (1 Johns Ch. 288, revd. on other grounds 18 Johns. 544, 563) bona fide purchasers have been protected where they took without knowledge because of a faulty transcription of an instrument due to the error of the clerk.

70 A.D. at 202, 431 N.Y.S.2d at 832 (citation omitted). In essence, the focus of the court in *Frost v. Beekman* was on determining rights between *subsequent innocent* purchasers for *value* and a mortgagee whose recorded mortgage was incorrectly transcribed for a lesser amount. To so narrow its focus, the court either ignored or distorted law applicable to an underlying escrow earlier in the chain of events.

## 2. Equitable Estoppel

In *United States v. Bedford Associates*, 491 F.Supp. 851 (S.D.N.Y.1980), the elements of equitable estoppel under New York law are clearly set forth.

The essential elements relating to the party to be estopped are: (1) conduct which amounts to a false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted; (2) intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel are: (1) lack of knowledge and the means of acquiring knowledge of the real facts, (2) reliance on the conduct of the party to be estopped, and (3) action based thereon resulting in a prejudicial change of position. *Id.* at 866–877. *See also In re Delta Hotel of Syracuse, Inc.*, 10 B.R. 585, 589 (Bkrtcy. N.D.N.Y.1981); *First Nat'l Bank v. Dean*, Super., 17 N.Y.S. 375, 377 (1892), *aff'd* 137 N.Y. 110, 32 N.E. 1108; 2 Warren's Weed N.Y. *Real Property*, Estoppel § 6.02 (4th Ed. 1980); 21 *N.Y.Jur.*, Estoppel § 21 (1961).

The debtor is the party against whom estoppel is asserted, and its past actions fall within the three applicable elements of the doctrine. The record is replete with its false representations, concealment of material facts, and conduct intended to mislead. Again, it must be recalled that WJC, Eastern Development, Mid-City and the debtor have common officers, general partners or limited partners. (facts 5, 8, 9) It is not disputed Cook has control of all these entities. (fact 6) As a result, the debtor had actual knowledge of the actions of all other entities within the Cook controlled group. (see facts 9, 45)

The following is some of the blatant misconduct by the debtor or other Cook-controlled entities with the debtor's acquiescence.[7]

(1) With the knowledge, permission and benediction of Cook (President of WJC [the general partner of the debtor] and a limited partner in the debtor), Erickson and Bailey executed a July, 1979 mortgage in which they warranted that they had title to the Property. (facts 36, 37)

(2) Again, in October, 1979, Bailey and Erickson, in a separate mortgage, warranted they had title, and again this was with the knowledge and permission of Cook. (facts 38, 39, 40, 41)

(3) Norman Kaye, an officer of WJC, filed a July 31, 1980 affidavit in state court asserting that "W.J.C. Realty Co." was the fee owner of the property. (fact 51)

(4) On January 22, 1980, WJC filed a mechanics lien against the property asserting "Ellison Park Apartments" was the owner. (facts 50, 53)

(5) During the entire time the debtor's claims ownership to the Property, Bailey and Erickson represented themselves as owners in all daily affairs, which actions were with knowledge and permission of the debtor. (facts 34, 54)

(6) On July 31, 1980, the debtor sent mailgrams to two of the defendants stating the owner of the property was "Ellison Park Associates." (fact 52)

In short, the debtor knew that others were asserting ownership in the Property it claims to own or were attributing ownership to other entities. That it intended other parties to rely upon these representations is self evident. (facts 37, 39) All the while, the debtor remained silent or actively promoted the facade. (facts 48, 56, 62)

Significantly, in New York equitable estoppel may be invoked because of silence or inaction. The elements that give rise to estoppel by silence are: (1) a duty to speak; (2) an opportunity to speak; and, (3) injury to another party as a result of the

---

7. The deceptive misleading and oft contradictory conduct evidenced in this proceeding by Cook and his controlled entities are apparently routinized and have been extensively reviewed by this court recently in *In re Eden Associates*, a Chapter 11 case dismissed under section 1112(b). See note 3, *supra*.

failure to speak. *Elmhorst v. Maziroff*, 93 Misc. 656, 657, 157 N.Y.S. 578, 579 *rev'd on other grounds*, 176 A.D. 145, 161 N.Y.S. 1029, *Aff'd* 223 N.Y. 649, 119 N.E. 1041; *See also Morgan v. Chicago and Hilton R.R. Co.*, 96 U.S. 716, 24 L.Ed. 743 (1877); *Hamlin v. Sears*, 82 N.Y. 327 (1880); *Viele v. Judson*, 82 N.Y. 32 (1880).

The debtor had a duty to speak when it had knowledge of others asserting title. Opportunities to speak abounded (i. e.: the state foreclosure action, see facts 56, 48, 57) A discussion of injury follows.

Defendants are the parties asserting equitable estoppel. Due to the debtor's secret— unnotarized, unrecorded—deed, defendants were unaware of and had no means of discovering the debtor's alleged ownership. (facts 43, 44) In reliance upon the stage set by the debtor, the defendants proceeded with the foreclosure sale. (facts 43–49) This resulted in a prejudicial change of position. If the debtor had title to the property, there would have been a violation of § 362. Further, during the more than three months between the commencement of debtor's chapter 11 case and its filing of this adversary proceeding, Ellison Park and Eastwood (two defendants) contracted for $797,550 and expended $162,900 for improvements and repairs on the property in addition to carrying costs and debt service. (facts 59–60) As of April 20, 1981, $505,383 had been expended. (fact 61)

 Among its applications, equitable estoppel is designed to preclude an owner of property from disputing that another has title when the true owner's conduct would lead a reasonable man to conclude that another has title. 2 Warren's Weed *New York Real Property* Estoppel § 2.02–.03 (4th Ed. 1980). This is precisely the case at hand. The debtor is estopped from asserting title to the property.

## V. CONCLUSION

The debtor has no interest whatsoever in the Property. Thus, the Property is not property of the estate, § 541(a), and the foreclosure sale upon it did not in any respect violate § 362. Accordingly, the adversary proceeding commenced by the debtor is dismissed. Moreover, as the Property is the debtor's sole claimed asset (facts 3, 4), the court's conclusion requires dismissal of the debtor's Chapter 11 case. § 1112(b)(1) & (2).

Defendants' motions for summary judgment are hereby granted. The debtor's Chapter 11 petition is dismissed. Costs and disbursements are granted to the defendants.

It is so ordered.